## Staunton

### SOUTHERN RAILWAY COMPANY, ET AL. v. COMMONWEALTH OF VIRGINIA EX REL., ETC., ET AL.

September 4, 1970.

Record No. 7257.

Present, All the Justices.

H. Merrill Pasco; Gordon F. Rainey, Jr. (Hunton, Williams, Gay, Powell & Gibson, on brief), for appellants.

Preston C. Shannon, Commerce Counsel, State Corporation Commission (Andrew P. Miller, Attorney General; D. Gardiner Tyler, Assistant Attorney General, on brief), for appellees.

HARRISON, J., delivered the opinion of the court.

Southern Railway Company (Southern) and Virginia and Southwestern Railway Company (V&SW) appeal from an order of the State Corporation Commission (Commission), denying correction of the assessment of their property for local taxation for the year 1968.

Appellants contend that the Commission erred in upholding its assessment of value based upon an equalization ratio of 40% because, when applied to the property of the V&SW, such ratio violates an administrative practice followed by the Commission of valuing V&SW property at 25% of actual market value.

They further contend that the Commission erred in refusing to permit the V&SW to file its separate tax report, the effect of which was to impose real property taxation on the Southern, as lessee, instead of the V&SW, as owner and lessor of the property.

Both appellants are public service corporations, organized under the laws of Virginia, and they are subject to taxation under Article 2 of Chapter 12 of Title 58 of the Code of Virginia.

The V&SW has been a wholly owned subsidiary of Southern since May 1, 1906, when the latter acquired all of its capital stock. The tracks of this company lie in four Virginia counties, Lee, Scott, Wise and Washington, and the City of Bristol.

On July 1, 1916, the V&SW leased all of its property to the Southern, ceased to be an operating railroad and became a non-operating entity.

The only income of the V&SW is derived from this lease. The annual rental paid is $25,000, plus an amount sufficient to pay the interest and sinking fund payments under certain mortgages executed by V&SW, and all taxes and licenses levied or assessed. The Southern has full occupancy, control and management of the properties of the V&SW, and has obligated itself to maintain the properties of the leased company in good condition and repair. The evidence developed that the Southern Railway System consists of a group of corporations, approximately 25 to 35 in number, made up of Southern and its affiliated and subsidiary railroad companies.

In 1926 the Commission ascertained the value of the real and personal property of the V&SW and assessed it at 25% of that value. On September 17, 1926, Mr. Lewis Spencer Epes, then a member of the Commission, wrote the following letter to the Seaboard Airline Railway with reference to the assessments on railroads:

> "In making its assessments, the Commission has tried to ascertain what is the fair value (100%) as of January 1, 1927, of the property being assessed; and then in general has taken 40% of this sum as the fair cash value for purposes of taxation.
>
> "There are some exceptions to this however, notably these: (1) in case of non-carrier property, it has used the ratio of assessed value to actual value ascertained as nearly as it could for the locality in which the non-carrier property was situated; and (2) in cases of certain carriers (as for example the Clinchfield Railway Company) whose properties lie only in a few counties, in which counties the average ratio of assessed value to actual value is apparently much below the average for the state, it has used a ratio consonant with the average for the counties in which the properties of the company lie."

Subsequent to 1926 the Commission followed a practice of assessing statewide railroads and those running through numerous counties at 40% of fair value. The record shows that of eleven short-line rail-

roads in Virginia, seven were assessed at 40%, three (including the V&SW) at 25%, and one (the Interstate, which runs through one city and two counties) at 30%.

In 1967 the Commission, following the receipt of complaints for not having increased the assessed value of railroad tracks in Virginia since 1926, determined to reassess these values for 1968. In connection with the proposed reassessment each railroad was requested to furnish the Commission with the total cost of its track in Virginia. In making its report the Southern included not only the track owned by Southern but also the track leased to it by V&SW. Witnesses for the Southern testified that this was done at the suggestion of the Commission, and because they thought the Commission desired it to include in its report the property of both railroads. The Attorney General denies that the Commission so requested. This conflict in the evidence is immaterial.

The Southern received from the Commission a detailed statement of 1968 assessments which reflected that the property owned by Southern, and that owned by the V&SW and leased to Southern, were both treated as the property of the Southern and equalized at a 40% ratio, except as required by Code § 58-512.1. This resulted in an additional tax assessed on the V&SW property for 1968 of $57,892.49.

On November 18, 1968, having paid 1968 taxes in accordance with the assessment, the Southern and V&SW jointly applied to the Commission, pursuant to Code § 58-672, for a review and correction of such assessment. They seek to exclude from the assessment all property owned by V&SW and leased to Southern, and to recover from local authorities all excess taxes paid on account of the alleged erroneous inclusion of the property of V&SW in the assessment of the value of the property of Southern. It also pays leave for V&SW to file its report of its property subject to local taxation, and to have such property so assessed, rather than that Southern be required to include the property of V&SW in its report.

In essence the complaint of appellants is to the action of the Commission in equalizing in 1968 the value of the V&SW property on the basis of a ratio of 40% of fair market value rather than the ratio of 25%.

The Commission held on March 18, 1969 that its assessment of value was correct and denied appellants' application for review and correction, to which action this appeal was taken.

■ Section 169 of the Constitution of Virginia requires the Commission to assess real property at fair market value, and Section 168 of the Constitution requires such assessment to be uniform on the same class of subjects within the territorial limits of the authority levying the tax.

The "fair market value standard", as required by the Constitution, has been the subject of countless decisions, editorials and articles. It has had the consideration of the General Assembly, the courts, the State Corporation Commission and numerous study commissions. All recognize that assessment of property is not an exact science. The value of land, buildings and tangible personal property is dependent upon many factors which cannot be prescribed by any general rule. And this court has said that the mandate of Section 169 of the Constitution has been so honored in the breach that no assessors feel called upon to apply it in practice. *Washington Bank* v. *Washington Co.*, 176 Va. 216, 10 S.E. 2d 515 (1940).

The courts, in trying to resolve this problem, while recognizing the general custom of undervaluing property and the difficulty of enforcing the standard of true value, have sought to enforce equality in the burden of taxation by insisting upon uniformity in the mode of assessment and in the rate of taxation. *Skyline Swannanoa, Inc.* v. *Nelson County*, 186 Va. 878, 44 S. E. 2d 437 (1947); *Greene v. Louisville and Interurban R. R. Co.*, 244 U. S. 499; 37 S. Ct. 673; 61 L. ed. 1280 (1917). And we have said the practice of the Commission in assessing the properties of public service companies at 40% of their fair market value does not constitute an abuse of the authority and discretion imposed on it by the Constitution and statutes of Virginia. *City of Richmond* v. *Commonwealth*, 188 Va. 600, 50 S. E. 2d 654 (1948).

The Commission is charged by Section 176 of the Constitution and Code § 58-522 with the annual responsibility of ascertaining and assessing in the manner prescribed by law the value of the roadbed of each railway corporation. It accomplishes this task by its own investigation and inquiry, and by requiring that certain data be provided by the railroads operating in the state. With the information collected, the Commission then determines the value of the property. In making this determination it has been the practice of the Commission to assess the real estate and tangible personal property of public service corporations at an amount equal to 40% of its fair market value. The Commission then certifies its assessments to the

governing bodies of the several counties, cities and towns of the state, and they impose the local tax rate and collect the taxes based on the 40% assessment.

It is a matter of public record, and common knowledge, that throughout Virginia there are political subdivisions that consistently assess local property for taxation at fair market values far below the statewide average. Appellants point to the 16.48% average assessment ratio on local property for 1966 in the four counties and city serviced by the V&SW, the average of 18.43% in the three counties serviced by the Louisville and Nashville Railway, the average of 15.55% in the four counties serviced by the Clinchfield Railway, and the average of 18.56% in the two counties and city serviced by the Interstate Railway. They argue that the property of these four railroads, which operate in only a few counties in Southwest Virginia, were equalized in ratios of less than 40% by the Commission in 1926 because the average ratios of assessed value to actual market value in these localities were far below the statewide average.

The Attorney General points to the seven short-line railroads that operate in Virginia where the Commission applied the same 40% equalization ratio as it did to statewide railway systems, notwithstanding the 1966 average assessment ratio in the counties and cities through which these seven operated varied from an average of 16.5% to 37.5% of fair value.

Nevertheless appellants argue that they should continue to enjoy the same assessment preference of 25%, which they have enjoyed from 1926 through 1967, and show that in 1968 the Commission continued the 30% assessment as to Interstate and the 25% assessment as to Clinchfield and as to Louisville and Nashville.

Southern and V&SW advance several arguments in support of their position. They rely most strongly upon the Epes letter and contend that since the Commission applied the 25% equalization ratio to the property of the V&SW from 1926 through 1967, it thereby established an administrative practice which should not be reversed now.

We cannot agree with this contention. We do not construe the Epes letter as a pronouncement by the Commission of an administrative policy. Rather it explained the manner in which the Commission ascertained the fair value of the property of certain public service corporations, including V&SW, as of January 1, 1927.

This was one commissioner's explanation of the assessment made for one year. It is manifest that if the Epes letter outlined an admin-

istrative practice it was not uniformly followed, for admittedly seven short-line railroads have been assessed at 40% notwithstanding their properties are located in a few counties (Winchester and Western Railroad Company in one county only) and in counties where the average ratio of assessed value to actual value is below the average for the state.

The Epes letter did not purport to interpret a provision of the Constitution of Virginia or a statute. It was not a rule, regulation or edict of the State Corporation Commission having the force and effect of law. It made no attempt to justify or explain the action of the Commission in according four short-line railroads preference other than to say the localities in which these railroads operate assess property much below the state average.

The practice of the Commission in assessing the four railroads at a percentage of fair value less than 40% from 1926 to 1967 did not have the effect of estopping the Commission from ever changing the ratio. The duty to determine value and assess properties of public service corporations is a continuing responsibility that must be performed annually.

In *Huffman Co.* v. *Unemploy. Comm.*, 184 Va. 727, 740, 741, 36 S. E. 2d 641, 646, 647 (1946), we considered the weight and effect to be given to interpretation of statutes by administrative officials charged with the enforcement, and, in the opinion by Mr. Justice Eggleston, said:

> "The argument is made that because a former unemployment compensation commissioner had ruled in 1938 and 1939 that the service now under consideration was excluded under the Act, the present commissioner and the lower court were powerless to change the ruling. In support of this argument the appellant cites such cases as *Richmond Food Stores* v. *Richmond,* 177 Va. 592, 15 S. E. (2d) 328, which hold that in the interpretation of statutes of doubtful meaning, the construction placed upon them by the administrative officials charged with their enforcement is entitled to careful consideration by the courts. *But it by no means follows that the interpretation of such administrative officials is binding either upon them, their successors, or the courts, or that it cannot be inquired into and changed if found to be erroneous. Hancock Co.* v. *Stephens,* 177 Va. 349, 356, 14 S. E. (2d) 332, 334; 50 Am. Jur., Statutes, sec. 319, p. 311.

"Here, as the record shows, the present unemployment compensation commissioner made no attempt to collect the taxes of which the appellant had been relieved by reason of the prior ruling. But being convinced that the prior ruling was erroneous, the present commissioner notified the appellant that it would no longer be adhered to, and that henceforth the appellant would have to pay the levies. This was eminently fair to the taxpayer and was certainly all that it was entitled to." (Emphasis added.)

Prior to the enactment of Code § 58-512.1, hereinafter discussed, there was no legal compulsion that the Commission continue the 40% ratio in fixing the annual assessments of railroad properties. In determining fair value it could have used some ratio higher or lower than 40%. The Commission adhered to 40% in all probability because it was regarded to be as equitable and as uniform an assessment as could be made, practically and realistically.

█ The Commission, as well as the courts and the General Assembly, have recognized through the years the vulnerability of this ratio. From time to time efforts have been made to abandon it as to properties of public service corporations and to impose the same assessment ratio on such properties as is applied to other property in the localities.

It was this possibility that very likely prompted the General Assembly of 1958 to adopt a House Joint Resolution, expressing the sense of that body that the method adopted and used by the State Corporation Commission, and the practice, procedures and rules that it had followed, were in conformity with law, in the best interest of the corporations involved and of the people of Virginia, and urging that they be continued. While this Resolution was but an expression of sentiment, the Commission continued to apply the 40% equalization ratio (except as to V&SW and the three other short-lines) from 1958 until the enactment in 1966 of Code § 58-512.1, referred to as the Bemiss Bill.

The General Assembly of 1966 came to grips with the problem that had been created by the practice of some localities of undervaluing property for assessment purposes and applying a high rate; and the policy of the Commission of assessing property of public service corporations at a rate of 40% of fair market value. The Legislature took cognizance of the inequities that existed and their need for correction. It also recognized that it would have to allow a period

of time for adjustment. Accordingly, it enacted Code § 58-512.1 designed to equalize gradually, over a period of twenty years, the assessment of all public service corporation property with the respective ratios in force in localities where the properties are located. It provides that all future increases in assessed valuations of public service company properties must be made by application of the local assessment ratio in the taxing jurisdiction where the property is located. In addition, each year beginning January 1, 1966, 1/20th of the 1966 assessed valuation is to be assessed at the local ratio and the remainder of the valuation continues to be assessed by application of the 40% assessment ratio as heretofore administered.

Appellants find comfort in the reference in Code § 58-512.1 to the application of the 40% assessment ratio "as heretofore administered". They interpret this language to indicate the intention of the General Assembly that those classes of property which, at the time of the enactment of Code § 58-512.1, were receiving a reduced assessment ratio, should continue to receive such treatment. However, it can be as forcefully argued that had the General Assembly been conscious of the preferred low assessment ratio accorded only four railroads in Virginia, and had they desired to perpetuate this differential, it would have simply eliminated the words "40 per centum" and said "by application of the assessment ratios as heretofore administered".

We are unwilling to give the statute a construction which would bar the Commission from equalizing the assessment ratio of the four railroads in question with that applied to all other railroads when, in the discretion of the Commission, such equalization is indicated and will promote uniformity.

In 1967 the Commission reexamined its valuations of the properties of railroads in Virginia and determined that the 40% equalization ratio should be applied in the assessment of the V&SW. The evidence shows that the V&SW has been completely integrated into the Southern Railway System. The Commission found as a fact that it is a segment or division of the Southern and concluded that the 25% assessment on the property of the V&SW gave to the Southern Railway a tax advantage over the other railroads that are identical with it in every material respect.

The Constitution of Virginia, § 156 (f), requires that the action of the Commission "shall be regarded as prima facie just, reasonable and correct." We are unable to say that its action is plainly wrong

or without evidence to support it. Clearly it was a decision within the power and discretion of the Commission.

 Neither can we find any denial to the Southern and V&SW of the equal protection of the laws by such action. *Skyline Swannanoa, Inc. v. Nelson County,* 186 Va. 878, 44 S. E. 2d 437 (1947) and *Lehigh Portland Cement Co. v. Commonwealth,* 146 Va. 146, 135 S. E. 669 (1926), cited by appellants, are not in point. In both cases the taxpayer's property had been assessed at a higher value proportionately than other property similarly situated. Here the property of the taxpayer (V&SW) was never assessed at a higher ratio and now is being assessed at the same ratio with other properties similarly situated, that is, with the property of statewide railroads and seven other short-line railroads.

V&SW complains that the Commission does not continue to give it preferential treatment since three other short-line railroads were still accorded a lower rate in 1968. Assuming, but not deciding, that the Commission should have increased the assessment ratio of the other three lines to 40% in 1968, this does not constitute a denial of equal protection of the laws to V&SW. The 40% assessment ratio on its property was not "out of line generally" with the assessment of other railroad properties in Virginia in 1968.

In *Washington Bank v. Washington Co.,* 176 Va. 216, 218, 10 S. E. 2d 515, 516 (1940) we said:

> "Before relief can be given it must appear that the assessment is out of line generally with other neighborhood properties, which in character and use bear some relation to that of a petitioner. It is not enough to show that it is valued above a rate apportioned to another near-by lot. The inequality must be not only out of line but out of line generally."

In *City of Richmond v. Commonwealth,* 188 Va. 600, 605, 606, 50 S. E. 2d 654, 656 (1948), we quoted the general rule with respect to the classification of subjects of taxation from 51 Am. Jur., Taxation, Section 173, pp. 230-231, as follows:

> " 'It is everywhere agreed that neither the Fourteenth Amendment to the Federal Constitution nor the equality and uniformity requirements of the state constitutions prohibit the making of classifications in state legislation relating to taxation. The power of a

state to make reasonable and natural classifications for purposes of taxation, it has been said, is clear and not questioned. Such classifications may be made with respect to the subjects of taxation generally, the kinds of property to be taxed, the rates to be levied or the amounts to be raised, *or the methods of assessment, valuation, and collection.* Granting the power of a state to make classifications in tax matters, it has been said, we must then grant the right to select the differences upon which the classification shall be based.' " (Italics were supplied by the court.)

And in the same opinion we quoted from *State Board of Tax Com'rs.* v. *Jackson,* 283 U. S. 527, 51 S. Ct. 540, 543, 75 L. ed. 1248, 1255-56, 73 A. L. R. 1464, 1472 (1931) as follows:

" 'The power of taxation is fundamental to the very existence of the government of the States. The restriction that it shall not be so exercised as to deny to any the equal protection of the laws *does not compel the adoption of an iron rule of equal taxation,* nor prevent variety or differences in taxation, or discretion in the selection of subjects, or the classification for taxation of properties, businesses, trades, callings, or occupations.' " (Italics supplied by the court.) 188 Va. at p. 607, 50 S. E. 2d at p. 657.

In *Union Tanning Co.* v. *Commonwealth,* 123 Va. 610, 638-39, 96 S. E. 780, 788-89 (1918), we said:

"If there be not a systematic, intentional discrimination between persons or classes of persons owning the same kind of property in the making or his correction of assessments, such action does not fall within the principle of the cases relied on by said company as aforesaid. *State* v. *Hall,* 172 Ala. 316, 54 So. 563; *Magnolia Bank* v. *Board of Supervisors,* 111 Miss. 857, 72 So. 697. As said in one of the cases last cited, 'the equal protection of the laws, does not mean equal immunity in its violation or evasion,' and, as pointed out in substance in both of such last cited cases, if, because a law for the assessment of property has been generally evaded by or not enforced for a time against owners of the same kind of property, until it has become a custom or rule among assessing officers to assess such property of all owners thereof at a certain percentage of and less than its fair cash value, instead of at its fair cash value, as the statute on the subject may require (as it does in Virginia),

it were held that the legislature and the courts or other legislatively authorized agencies, are powerless to correct any one of such assessments, until and unless all of them are corrected, that would be, in effect, to allow violators of the law to repeal the law, or to beget a constitutional right in every evader of the law to plead immunity from its enforcement except upon condition that no other evader of it be allowed to escape from its requirements. There would be an end of all government of laws if such a rule of constitutional construction could prevail.

"There is no evidence in the case before us that the making or correction of its assessment for the years in question, by the assessment against it of omitted capital as aforesaid for those years, was in pursuance of any discrimination against said company, as a class or a member of a class."

We find no invidious discrimination practiced by the Commission in increasing the assessment ratio of the property of V&SW in 1968 from 25% to 40% after having accorded this railroad four decades of preferential treatment. For reasons the Commission found valid and proper, the assessment ratio of four railroads had been made lower than the statewide ratio applied to other railroads. In 1968 it adjusted the assessment ratio of the V&SW, and in 1969 the remaining three short-line railways to 40%. We find no violation of the 14th Amendment of which the V&SW can complain.

■ We do conclude that the Commission was in error in refusing to permit the V&SW to file its separate tax report, and in refusing to assess the value of its property separately from that of the Southern. Though the record shows clearly that the V&SW is a non-operating railroad, its corporate status remains unchanged. It is managed and controlled by corporate officers and a board of directors. It is immaterial that with one exception the officers and directors also serve in the same capacity with the Southern. At the expiration of its present lease with the Southern, the property of the V&SW will again be under the control of its directors. It is the owner of real and personal property and as such the burden of property tax falls upon it. *Richmond* v. *Monument Avenue Development Corp.*, 184 Va. 152, 34 S. E. 2d 223 (1945); *Richmond F. & P. RR.* v. *Commonwealth*, 203 Va. 294, 124 S. E. 2d 206 (1962); 84 C. J. S., Taxation, Section 92. See also Section 176 of the Constitution of Virginia; Code § 58-524 (8); Code § 58-522; and Code § 58-796.

In the instant case, the Southern is the lessee of property that is owned by V&SW. The fact that Southern is obligated under its lease to pay the taxes, whether reported by and assessed to the V&SW, or incorporated with the property of the Southern and assessed jointly, is not material. The V&SW is a separate corporate entity from the Southern, and the tax should be imposed on it.

We sustain the action of the Commission in applying to the property of the V&SW the equalization ratio of 40% of its actual fair market value. We find the Commission was in error in assessing the value of the property of the V&SW as the property of Southern, and this case is remanded with direction that the Southern and V&SW be permitted to file separate property tax reports.

*Affirmed in part, reversed in part and remanded.*