## Richmond

## Norfolk and Western Railway Company v. Commonwealth of Virginia, Et Al.

March 8, 1971.

Record No. 7425.

Present, All the Justices.

*John W. Riely* (*H. Merrill Pasco; Guy K. Tower; David R. Goode; Hunton, Williams, Gay, Powell & Gibson,* on brief), for appellant.

*Preston C. Shannon; A. C. Epps* (*Andrew P. Miller, Attorney General; Henry M. Massie, Jr., Assistant Attorney General; Stuart B. Carter; J. Edward Betts; Hullihen W. Moore; Carter & Roe; Christian, Barton, Parker, Epps & Brent,* on brief), for appellees.

HARMAN, J., delivered the opinion of the court.

This is an appeal by the Norfolk and Western Railway Company (N. & W.) from an order entered on November 21, 1969, by the State Corporation Commission (the Commission) denying N. & W.'s application for correction of the assessment for 1968 made by the Commission on certain properties of N. & W. which are subject to taxation by the local taxing authorities of the political subdivisions of the Commonwealth.

The petition for correction sought a reduction in the assessment on two classes of property, namely:

(1) the roadbed and track, exclusive of land, (track properties or track) and

(2) signal, car retarder and interlocker equipment (signal properties).

In its petition before the Commission N. & W. alleged that the Commission had erroneously valued its track properties at $141,851,-035 and its signal properties at $11,661,001 when the fair cash value of these properties should have been fixed at $34,368,774 and $2,000,-000 respectively.

Real estate and tangible personal property are required to be assessed for taxation at their fair market value under § 169 of the Constitution of Virginia. Section 168 of the Constitution requires such assessments to be uniform on the same class of subjects within the territorial limits of the authority levying the tax. *Southern Ry. Co.* v. *Commonwealth*, 211 Va. 210, 214, 176 S.E.2d 578, 580 (1970).

Under § 176 of the Constitution a duty is imposed upon the Commission to annually ascertain and assess the real estate and personal property of each railway company "(except its franchise and the nontaxable shares of stock issued by other corporations)".

The annual franchise tax upon railroads, based on gross receipts, is imposed by § 177 of the Constitution and the rate at which such tax is computed is fixed by Code § 58-519. Since the franchise tax is based on gross receipts no provision is made for an appraisal or determination of the fair market value of the franchise either by the Constitution or by statute.

Section 177 of the Constitution provides that the annual franchise tax shall be in lieu of all other taxes imposed on the corporation's franchise and all shares of stock issued by it. Code §§ 58-516 and 517 provide that such franchise tax shall be in lieu of a state tax on intangible personal property and money.

■ As we pointed out in *Southern Ry. Co.* v. *Commonwealth*, *supra*,

"The 'fair market value standard', as required by the Constitution, has been the subject of countless decisions, editorials and articles. It has had the consideration of the General Assembly, the courts, the State Corporation Commission and numerous study commissions. All recognize that assessment of property is not an exact science. The value of land, buildings and tangible personal property is dependent upon many factors which cannot be prescribed by any general rule. And this court has said that the mandate of Section 169 of the Constitution has been so honored in the

breach that no assessors feel called upon to apply it in practice. *Washington Bank* v. *Washington Co.*, 176 Va. 216, 10 S.E.2d 515 (1940).

"The courts, in trying to resolve this problem, while recognizing the general custom of undervaluing property and the difficulty of enforcing the standard of true value, have sought to enforce equality in the burden of taxation by insisting upon uniformity in the mode of assessment and in the rate of taxation. *Skyline Swannanoa, Inc.* v. *Nelson County*, 186 Va. 878, 44 S.E.2d 437 (1947); *Greene* v. *Louisville and Interurban R. R. Co.*, 244 U.S. 499, 37 S.Ct. 673; 61 L.ed. 1280 (1917). And we have said the practice of the Commission in assessing the properties of public service companies at 40% of their fair market value does not constitute an abuse of the authority and discretion imposed on it by the Constitution and statutes of Virginia. *City of Richmond* v. *Commonwealth*, 188 Va. 600, 50 S.E.2d 654 (1948)." 211 Va. at p. 214, 176 S.E.2d at p. 580-81.

In 1966 the General Assembly, recognizing the inequities which resulted to public service corporations from the practice of some localities in undervaluing property assessed locally for tax purposes and applying a high tax rate, enacted Code § 58-512.1 designed to equalize, over a twenty-year period, the assessment of the property of public service corporations with the ratios in force in the localities where the properties are located.

Section 156(f) of the Constitution provides that upon appeal the action of the Commission shall be regarded as "prima facie just, reasonable and correct."

In addition it is well settled that there is a presumption in favor of the correctness of a tax assessment and the burden is upon the property owner who questions it to show that the value fixed by the assessing authority is excessive. *City of Richmond* v. *Chesterfield Apartment Co.*, 206 Va. 22, 25, 141 S.E. 2d 703, 706 (1965); *City of Norfolk* v. *Snyder*, 161 Va. 288, 291, 170 S.E. 721, 722 (1933).

The effect of this presumption is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment erroneous. *Shaia* v. *City of Richmond*, 207 Va. 885, 893 (fn. 7); 153 S.E.2d 257, 263 (1967).

N. & W., therefore, has the burden of showing that the assessment by the Commission is excessive.

In 1967, at the request of local taxing authorities, the Commission undertook to study and review its valuation and assessment of track properties.

In October, 1967, the railroads were advised that the Commission was undertaking such a study and each railroad was requested to provide the Commission with a statement showing the original cost of its track properties when first placed in service.

N. & W. was unable to furnish this information from its books which are kept and maintained under the system of uniform accounts established and made mandatory under the regulations of the Interstate Commerce Commission.

Under this system of accounting the track properties are carried on the books of the railroad at their cost of construction and betterments. No depreciation is charged to the capital account but replacement of existing components is charged as an expense of operation as these components are replaced. The capital account is added to only where there is a betterment, such as replacement of 100 pound rail with 130 pound rail, and then only the difference in cost is added to the capital account as a betterment.

N. & W. did undertake, with the assistance of an accounting firm, to make an estimate of the original cost of its track properties. This original estimate of cost of $177,800,335 was furnished to the Commission in January, 1968. Later, in evidence before the Commission, the accountants revised this estimate to $187,985,461 and the evidence established that cost of cuts, fills and grading in the construction of the track properties, which amounted to a total of $50,514,301 as of December 31, 1967, was not included in either the original or revised estimate of cost.

Prior to 1968 there had not been a general reappraisal and reassessment of the track properties of railway companies by the Commission since 1926. In 1926 the Commission conducted an extensive study and evaluation of the track properties of each of the railway companies operating in the Commonwealth for each of the classifications of track used by the Commission as the basis of its assessment. As a result of these studies fair cash values or fair market values per mile were established for each of these classifications of track property for each railroad. Thereafter until 1968 the values established by the 1926 studies were the basic values used in computing assessments made by the commission of track properties. The single exception to this procedure appears to be a small downward adjustment

in the value of double main line track of each of the railroads which was first effective for the tax year 1933.

The evidence establishes that the Commission, in making its 1968 valuation of track properties of N. & W., depreciated the cost, as originally reported by N. & W., by 20% and arrived at a fair cash value or fair market value of $142,240,268 for N. & W.'s track properties. This procedure resulted in an increase in the fair cash value or fair market value of N. & W.'s track properties from $91,644,710 in 1967 to $142,240,268 in 1968, an increase in fair cash value of approximately 55%. The fair cash value fixed by the Commission is, of course, the base from which the assessments are computed on N. & W.'s track properties for local taxation.

During its investigation of the original cost of track properties, the Commission learned that the railroads, in their annual reports to the Commission, were reporting the fair market value or fair cash value of all their signal properties, except grade crossing protective devices, at 50% of original cost. No value was being reported for tax purposes by any of the railroads for grade crossing protective devices.

The Commission then requested the railroads to provide it with the original cost of all signal properties in Virginia. N. & W. filed a report with the Commission in June, 1968, showing the original cost as of December 31, 1967, of highway crossing protective devices was $1,922,802 and all other signal properties was $16,775,021, or a total original investment in signal properties of $18,697,823.

Mathematical adjustments were made by the Commission to delete certain items which were otherwise taxed and the fair market value or fair cash value of the signal properties was fixed at 80% of original cost. This valuation was used as the base from which 1968 assessments were computed on N. & W.'s signal properties for local taxation.

The valuation and assessment of railway track and signal properties under the fair market value standard of § 169 of the Constitution present a difficult problem because, as witnesses for both sides concede, railroads are seldom sold so there are no comparable sales available to the Commission to assist it in arriving at its valuations. In the absence of such comparable sales, which would be the best and fairest standard for fixing fair market values, it is necessary for the Commission to arrive at a judgment on fair market value of the track and signal properties on the basis of the other indicia of fair market value available to it.

In *Whitworth* v. *State Hy. Comm.*, 209 Va. 95, 161 S.E.2d 698 (1968), we recognized that evidence of reproduction cost of im-

provements less depreciation was proper evidence to be considered by a condemnation commission in arriving at its award where there were no recent sales of comparable property.

We have held that an assessment based on reproduction cost less depreciation was excessive and should be reduced when the assessor as well as other witnesses agreed that the property would not sell for this amount in the open market when comparable sales were considered. *Tuckahoe Woman's Club* v. *City of Richmond*, 199 Va. 734, 101 S.E.2d 571 (1958).

At the hearing before the Commission evidence was presented showing that the reproduction cost of N. & W.'s track properties less depreciation would be $360,100,000 and that reproduction cost of its signal properties less depreciation would be $22,019,000.

The Commission also had the benefit of evidence that N. & W. had spent more than $227,000,000 for maintenance of its track properties (including replacement of rails, ties and ballast) between 1926 and 1968, of which the sum of $33,947,744 was spent between 1960 and 1968.

Between 1929 and 1968 the average cost per ton of main line rail had increased from $38.65 to $107.74 and the average cost of ties had increased from $1.60 to $5.11. The average cost of the component parts of track properties increased by 142% between 1926 and 1968.

The record also shows that N. & W. had spent $16,775,021 for additions to its signal properties in Virginia between 1952 and 1968 and that the depreciated value of its signal properties, as shown by its books on January 1, 1968, was $15,005,481.

Certainly these were indicia of value and all proper factors for the Commission to consider in determining whether the assessment which it had previously made was excessive.

A number of expert witnesses testified about the percentage condition of N. & W.'s track and signal properties as compared to new. Their estimates of this condition varied from 48%, as testified to by one of the N. & W. witnesses, to 80%, testified to by witnesses for the Commission.

The values testified to before the Commission by witnesses for N. & W. generally fell into two classes.

One line of testimony showed the value of the component parts of the track and signal properties for what N. & W.'s witnesses called "reuse". Counsel for the Commission and the localities prefer to refer to these values as "junk," "scrap" or "salvage" values. N. & W. argues that we should adopt these values since the Commission is

directed by § 176 of the Constitution to ascertain and assess the value of tangible properties of the railroads except its franchise.

It points out that we said in *Railway Express Agency, Inc.* v. *Commonwealth*, 199 Va. 589, 596, 100 S.E.2d 785, 790-91 (1957), affirmed 358 U.S. 434, 79 S.Ct. 411, 3 L.ed. (2d) 450 (1959):

" . . . (I)n making the assessments of the tangible property for local taxation, the Commission must *exclude* such franchise value as may be inherent therein, with the result that only the 'bare bones' value of such property is taxed by the localities, leaving the intangible or 'going concern' value to be taxed by the state . . ."

■ In so saying we were not unmindful of the fundamental rule that in assessing all tangible properties for tax purposes such properties should be assessed at their highest and best use. In this case the highest and best use would be as an operable railroad.

The fallacy of the reuse or salvage theory advanced by the N. & W. is demonstrated by the fact that the witnesses who testified and fixed values based on this approach agreed that it would reflect no value for engineering, grading and fills, tunnels and subways, bridges, trestles and culverts, bridge ties, ballast, track laying and surfacing, fences, snowsheds and signs, and overheads, all of which are necessary to and a valuable part of the track properties of N. & W. as an operable railroad. Under this reuse or salvage approach the Mona Lisa would be valued, for tax purposes, at the reuse or salvage value of its pigments, canvas and wood.

■ The other valuation testimony presented by N. & W. witnesses was based upon the so-called "unit" or "Connecticut" method of valuation of railroad properties. While this method of taxation is used in many states, the Constitutional Convention of 1901-02 considered and rejected it as the method of taxation to be followed on railroad properties in Virginia. It is interesting to note that the drafters of the sections on taxation considered the unit method desirable and were ready to recommend the adoption of this method to the Convention. It was because of the objection of the representatives of the railroad companies that the unit method was rejected and the present system of taxing the franchise separately from the trangible properties of railway companies was adopted. See Debates of Constitutional Convention, 1901-1902, Vol. 11, pp. 2640-2676.

That the unit approach and the Virginia system of taxation of railroad properties are incompatible is amply demonstrated by the fact

that one of the N. & W. witnesses, using the unit method, after deducting the value which he assigned to franchise, rolling stock and real estate, arrived at a minus value for N. & W.'s track and signal properties in Virginia.

■ N. & W. objects to the inclusion of the cuts, fills, track surfacing, excavation, ballast, bridges, trestles and tunnels in the valuation and assessment of its track properties. The railroad says that these items are a part of its real estate, which is separately assessed for taxation, and that to include them in assessing the track properties would result in double taxation.

We find this argument to be without merit since Code § 58-532 requires the assessment of track properties made by the Commission to include cuts, fills, track surfacing, excavation, ballast, bridges, trestles and tunnels and the evidence produced by the Commission shows that these components of the track properties were, in fact, excluded in assessing right of way lands.

■ Finally N. & W. argues that if the Commission was correct in using its original estimated costs, a depreciation of more than 20% should have been deducted from these estimates since all of its experts testified to a higher percentage of depreciation.

It suffices to say that the credibility of witnesses and the weight to be given to the testimony of such witnesses is a proper matter for the determination of the trier of facts. The findings of that body will be given great weight on appeal and will not be disturbed unless based on evidence which is inherently incredible or unless they are without evidence to support them.

Because of the absence of comparable sales, the evidence before the Commission represented four possible approaches in calculating the value of N. & W.'s track and signal properties.

The reuse or salvage method was considered but was not used by the Commission because it did not represent fair market value for the reasons set forth.

The reproduction cost less depreciation method was considered and was not used because the Commission found it would be unfair to N. & W. To have used this method would have resulted in much higher assessments than the original cost less depreciation method adopted.

The unit method of valuation was properly rejected because of the constitutional history earlier set forth and because it is incompatible with the constitutional plan for taxation for railroad properties in Virginia.

The original cost less depreciation method, which was the only re-

maining method available to the Commission, was the one used by it in making the assessment.

N. & W. had the burden of establishing that the assessments by the Commission were excessive. This it has failed to do, so we must affirm the action of the Commission.

*Affirmed.*