# Winchester and Western Railroad Company
## v.
# State Corporation Commission

Record No. 880537

November 18, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Gordon, Retired Justice

*Joseph C. Shapiro (F. L. Largent, Jr.*, on brief), for appellant.
*Wayne N. Smith (Lewis S. Minter; Anthony Gambardella*, on brief), for appellee.

THOMAS, J., delivered the opinion of the Court.

In this appeal of right from the State Corporation Commission (the Commission), Winchester and Western Railroad Company (Winchester) contends that the Commission erred in assessing, against all 323 of its railcars, the rolling stock tax provided for in Code §§ 58-515 and 58-524(5). This appeal concerns the taxes imposed on Winchester's railcars in 1982 and 1983.* The 1982 taxes were based on data from calendar-year 1981; the 1983 taxes were based on data from calendar-year 1982. According to Winchester, in both 1981 and 1982, only 86 of its railcars were

---

* *W. & W. Ry. Co. v. Commonwealth*, 226 Va. 352, 309 S.E.2d 590 (1983), concerned the 1981 rolling stock tax on Winchester's railcars.

used in Virginia. The remaining 237 railcars were used in other parts of the United States. Winchester submits that the railcars not used in Virginia acquired tax situses in other jurisdictions and thus could not constitutionally be taxed by Virginia.

The Commission ruled against Winchester on the ground that Winchester had failed to meet its burden of proving that the railcars not used in Virginia had established tax situses in other *particular* jurisdictions. In our opinion, the Commission correctly decided this matter.

Winchester is a Virginia corporation. It owns eighteen miles of track, all located within the Commonwealth between Gore and Winchester. In the tax years here in question, Winchester had 323 railcars under lease and thus subject to taxation.

Winchester is a wholly owned subsidiary of Unimin Corporation which produces silica sand in Virginia and in various other states, including Illinois, Minnesota, and New Jersey. Winchester provided railcars to serve Unimin's Virginia plant. The Unimin plant in Illinois was served by a railcar pool provided by the Baltimore and Ohio Railroad. The plants in Minnesota were served by a railcar pool provided by the Chicago and Northwestern Railroad. And, the plants in New Jersey were served by a railcar pool provided by Conrail. In the early 1980's, Unimin concluded that the three railcar pools serving its Illinois, Minnesota, and New Jersey plants did not contain enough of certain types of railcars to meet Unimin's needs.

In 1981 and 1982, Winchester railcars, all bearing Winchester markings, were dispatched from Virginia to become part of the three previously described railcar pools. In 1981, 122 Winchester railcars were sent to the Illinois pool; 68 to the Minnesota pool; and 48 to the New Jersey pool. In 1982, 123 Winchester railcars were sent to the Illinois pool; 69 to the Minnesota pool; and 45 to the New Jersey pool. The Winchester cars sent to the three railcar pools were marked to be returned to these pools when empty.

The evidence adduced by Winchester reveals that the nature of these railcar pools was such that Winchester's railcars were simply mixed in at random with all the other railcars in the various railcar pools. Railcars from the three pools were loaded and sent to customers in a random manner. That is to say, no particular railcar, Winchester or otherwise, was loaded and sent to a particular customer in a particular state. Consequently, on any given day, for example, a Winchester railcar, because it happened to be part

of the pool serving the Minnesota plants, might be loaded in Minnesota and sent to a customer in Texas; the next day a railcar from the same Minnesota pool, but owned by another carrier, might be loaded in Minnesota and sent to the same customer in Texas over the same route. But a Winchester railcar from the Minnesota pool might be used to serve that Texas customer the next day, the next month, or never again. It was all completely up to chance.

As suggested by the foregoing example, the railcars sent to the three railcar pools were not used exclusively in Illinois, Minnesota, or New Jersey. The Illinois plant sent shipments to 48 customers in 13 states and 1 Canadian province. One New Jersey plant sent shipments to 9 customers in 5 states; the other New Jersey plant sent shipments to 3 customers in 3 states. One Minnesota plant sent shipments to 71 customers in 17 states and 2 Canadian provinces; the other Minnesota plant sent shipments to 15 customers in 4 states and 1 Canadian province. The five plants which used railcar pools that included Winchester railcars shipped to a combined total of 146 customers in 23 different states and 2 different Canadian provinces. Because of the way the pools were operated, Winchester railcars could have been shipped to any of those customers in any of those states and Canada at any time or at no time.

In its effort to prove that only the 86 railcars used in Virginia in 1981 and 1982 could be taxed by Virginia, Winchester proved the number of times its railcars were loaded at the Unimin plants in Illinois, Minnesota, and New Jersey. It also proved the states through which a railcar would have to travel to get from a particular plant to a particular customer.

On appeal of a tax assessment by the Commission, the burden is on the taxpayer to prove that the assessment is erroneous. *N. & W. Ry. Co.* v. *Commonwealth*, 211 Va. 692, 694, 179 S.E.2d 623, 626 (1971). Further, the findings of the Commission will be given great weight on appeal and will not be disturbed unless based on inherently incredible evidence or unless unsupported by evidence. *Id.* at 700, 179 S.E.2d at 629; *accord Farmers and Merchants* v. *Commonwealth*, 213 Va. 401, 192 S.E.2d 744 (1972). In our opinion, Winchester has not met this burden. This is so principally because Winchester did not meet the burdens imposed upon it in the original proceeding before the Commission.

As pointed out earlier, Winchester is a Virginia corporation with all of its track located within the Commonwealth. When Winchester was before this Court challenging its 1981 rolling stock tax, we approved the "basic presumption . . . that an intrastate railroad has only enough cars to render its public service in Virginia and that it is habitually using all its own cars for that purpose." *W. & W. Ry. Co.* v. *Commonwealth*, 226 Va. 352, 359, 309 S.E.2d 590, 595 (1983). We went on to say that one way in which Winchester could rebut that presumption was by showing that some of its railcars had established a tax base elsewhere.

The question whether a railroad has established a tax base outside its domiciliary state for certain of its property has long been the subject of federal constitutional law. *See, e.g., Pullman's Car Co.* v. *Pennsylvania*, 141 U.S. 18 (1891). This is so because the taxation of property used in interstate commerce raises questions under both the Commerce Clause and the Due Process Clause of the Fourteenth Amendment. *Braniff Airways* v. *Nebraska Board*, 347 U.S. 590, 598-99 (1954).

■■■ The Supreme Court has attempted to strike a balance between the power of a domiciliary state to tax property of one of its domestic corporations wherever that property might be and the power of a nondomiciliary state to tax property found within its borders. The Supreme Court has expressed two key concerns: (1) that property used in interstate commerce should not be subject to multiple taxation, *Central R. Co.* v. *Pennsylvania*, 370 U.S. 607, 612 (1962); *Standard Oil Co.* v. *Peck*, 342 U.S. 382, 384 (1952), and (2) that property used in interstate commerce should not escape all taxation, *Central R. Co.*, 370 U.S. at 616-17; *Northwest Airlines* v. *Minnesota*, 322 U.S. 292, 300 (1944); *Pullman's Car Co.*, 141 U.S. at 29. Thus, the Supreme Court is concerned both with over-taxation and under-taxation. The aim is correct taxation, such that property used in interstate commerce is taxed to 100 percent — and no more — of its value by all the taxing jurisdictions which can legitimately assert a right to tax. Because the taxpayer who owns or controls movable property should know where the property is and how it is being utilized, the burden is on the taxpayer to prove the appropriate nondomiciliary tax situs. If the taxpayer fails in this proof, then the domiciliary state can tax the property to 100 percent of its value.

The most pertinent case in the area of a domiciliary state's power to tax movable property used outside the state is *Central R.*

*Co. v. Pennsylvania*, 370 U.S. 607 (1962). There, Pennsylvania sought to impose a property tax upon all of the rolling stock of a Pennsylvania railroad even though a considerable number of the railcars in question spent a substantial portion of the tax year on the lines of other railroads located outside Pennsylvania. Central owned 3,074 railcars during the pertinent tax year. Some of the cars were used by Central on its own tracks in Pennsylvania; others were used by Central's parent company, Central Railroad Company of New Jersey (CNJ), on that company's tracks in New Jersey; and others were used by unaffiliated railroads on their lines in various parts of the country. The dispute focused upon Pennsylvania's power to tax the railcars used in New Jersey and across the country.

The Supreme Court ruled that there were two ways in which Central could show that its railcars had established a tax situs in another state: (1) by proving that the railcars travelled through particular states on fixed and regular routes or (2) by proving that a substantial number of railcars were used on irregular routes in particular states. Under either approach, Central was required to establish the average number of railcars so used in a particular state. Applying that test to the facts in *Central R. Co.*, the Court concluded that Pennsylvania could not tax the railcars used in New Jersey but could tax the railcars used at random in various other parts of the country.

With regard to the railcars used in New Jersey, the Supreme Court held that Pennsylvania could not tax all of their value because they were used in New Jersey on fixed routes and regular schedules. The Supreme Court concluded that such use amounted to habitual employment of the railcars in New Jersey. The Court wrote as follows: "Their habitual employment within the jurisdiction in this manner would assuredly support New Jersey's imposition of an *apportioned* ad valorem tax on the value of the appellant's fleet of freight cars." *Central R. Co.*, 370 U.S. at 613, (emphasis in original). The Supreme Court then held that "the *daily average* of freight cars located on the CNJ lines in the 1951 tax year . . . could not constitutionally be included in the computation of this Pennsylvania tax." *Id.* at 614 (emphasis added).

With regard to the railcars used in various other parts of the country outside of Pennsylvania, the Court concluded that the taxpayer had simply failed to meet its burden of proving the existence of another tax situs. The Court wrote as follows:

[T]his record shows only that a determinable number of appellant's cars were employed outside the Commonwealth of Pennsylvania during the relevant tax year. *But as this leaves at large the possibility of their having a nondomiciliary tax situs elsewhere, that showing does not suffice under our cases to exclude Pennsylvania from taxing such cars to their full value.*

*Id.* at 616 (emphasis added).

 *Central R. Co.*, along with other cases referred to above in this opinion, guide the proper disposition of the present appeal by supplying us with the following legal principles: The domiciliary state has the power to tax all of the property of a domiciliary corporation unless the taxpayer proves that some or all of that property has established a tax situs elsewhere. To establish a tax situs in nondomiciliary states, the taxpayer must prove either that certain of its property moved through those states on fixed and regular routes or must prove that certain of its property was habitually employed in the other states in substantial numbers over irregular routes. No matter which approach is taken to establish another tax situs, the taxpayer must show the average number of railcars used in the other states. A taxpayer cannot meet its burden of proof of another tax situs simply by proving that the property in question was outside of the domiciliary state during the pertinent tax year.

 With the foregoing principles in mind, we think it plain that Winchester cannot prevail in its appeal. This is so because Winchester failed by either approach set forth in *Central R. Co.* to prove the existence of any other tax situs for the property. Of course, this proof had to be made by Winchester in order to rebut the presumption that because Winchester is a Virginia intrastate railroad, all its railcars are habitually used in Virginia.

 Winchester failed to prove that *its* railcars travelled fixed and regular routes in other states. What Winchester proved is that its parent company, Unimin, had fixed routes for making deliveries to its various customers. Even if we assume that Winchester also proved that Unimin had a regular schedule of deliveries to its various customers, the fact remains that Unimin's routes and schedules do not establish that Winchester's railcars travelled fixed and regular routes. The Commission wrote as follows in re-

jecting Winchester's claim that it had proved some of its railcars travelled fixed and regular routes in other states:

> W & W's evidence does not support a finding of tax situs on the basis of regular routes, interstate or intrastate, in any foreign jurisdiction. The record shows that, once assigned to the Minnesota, Illinois, or New Jersey pools, W & W cars were used at random as the volume of shipments required. The record leads us to conclude that W & W cars were not assigned to transport sand to any particular shipper or to any particular group of shippers. While chance no doubt resulted in repeat movements by W & W cars — perhaps, frequently — the evidence does not convince us that identified W & W cars operated over regular routes in states other than Virginia so as to establish a tax situs elsewhere.

We agree with the Commission's conclusion in this regard.

■ Winchester argues that even if its evidence was insufficient to prove the existence of another tax situs based on fixed and regular routes, it is certainly sufficient to prove habitual presence in Illinois, Minnesota, and New Jersey. We disagree. The only proof of habitual presence in Illinois, Minnesota, and New Jersey was the number of times the railcars in question were loaded in those states in 1981 and in 1982. This proof is plainly insufficient under the *Central R. Co.* analysis of habitual presence based on irregular routes. The precise language from *Central R. Co.* on this issue is as follows:

> [A] nondomiciliary tax situs may be acquired even if the rolling stock does not follow prescribed routes and schedules in its course through the nondomiciliary State. In *American Refrigerator Transit Co.* v. *Hall*, 174 U.S. 70, this Court sustained the constitutionality of a Colorado property tax on a stipulated *average number of railroad cars* that had been located *within the territorial limits* of Colorado *during the tax year*, although it was agreed by the parties that the cars "never were run in said State in fixed numbers nor at regular times, nor as a regular part of particular trains." *Id.*, at 72. Habitual employment within the State of a substantial number of cars, albeit on irregular routes, may constitute sufficient contact to establish a tax situs permitting *taxation of the average number of cars so engaged.*

370 U.S. at 615 (emphasis added). Proof of the average number of cars irregularly used in a nondomiciliary state is an essential element of proving the existence of another tax situs based on the irregular route approach to habitual presence. Such proof is completely lacking in this case.

In short, all Winchester really proved was that in 1981 and 1982, 237 railcars were located outside of Virginia in several other states during the tax years. This proof falls far short of what is required to defeat a domiciliary state's power to tax the property of one of its corporations.

For all the foregoing reasons, the Order of the Commission herein appealed will be

*Affirmed.*