# Richmond

RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY v. COMMONWEALTH OF VIRGINIA, EX REL., ETC., ET AL.

March 5, 1962.

Record No. 5382.

Present, All the Justices.

*R. Colston Christian*, for the appellant.

*A. Carter Whitehead* and *Eldridge K. Hayes, Assistant City Attorney for the City of Alexandria*, for the Commonwealth, Et Al.

WHITTLE, J., delivered the opinion of the court.

This is an appeal of right by the Richmond, Fredericksburg and Potomac Railroad Company from an order entered by the State Corporation Commission denying its application for the correction of the Commission's assessment of the value of certain real estate belonging to the railroad, located in the City of Alexandria.

The real estate involved consists of 313 acres of land known as Potomac Yard, located in the heart of the city, fronting 7200 feet on U. S. Highway No. 1; 296 acres of the land is used for a freight and interchange yard where all freight handled by the Pennsylvania Railroad Company and the Baltimore and Ohio Railroad Company to and from the north, and all freight handled by the Chesapeake and Ohio Railway Company, the Southern Railway Company and the appellant to and from the south, is classified and interchanged. The remaining 17 acres are used for tracks over which the Chesapeake and Ohio Railway Company, the Southern Railway Company and the appellant, operate passenger trains to and from the District of Columbia.

The real estate was assessed in 1960 by the Commission's Division of Public Utility Taxation on a square foot basis in four zones as follows:

| | | |
|---|---|---|
| Zone 118 | 76.55 acres | $ 995,150 |
| Zone 119 | 161.86 acres | 2,104,180 |
| Zone 120 | 71.73 acres | 136,287 |
| Zone 121 | 2.86 acres | 37,180 |
| | 313.00 acres | $3,272,797 |

The 1959 assessment was also on a square foot basis and was the same as the 1960 assessment.

In 1958 and for several years prior thereto the real estate was assessed on a front foot basis as follows:

| | | |
|---|---|---|
| Zone 118 | 76.55 acres | $ 207,451 |
| Zone 119 | 161.86 acres | 335,050 |
| Zone 120 | 71.73 acres | 15,422 |
| Zone 121 | 2.86 acres | 1,373 |
| | 313.00 acres | $ 559,296 |

There was no complaint as to the method of assessment until the value of $559,296 for 1958 had been raised to $3,272,797 for the years 1959 and 1960.

The assessment was made by Charles W. Dickinson, the Commission's Chief Public Utility Appraiser. The assessment was arrived at by first determining the square foot value of various adjacent parcels of locally assessed industrial land; then reducing this square foot value in order to compensate for the difference in topography and size of the railroad's real estate; and then applying the reduced square foot value to the property.

By this method the value of 75¢ per square foot was placed on 241.27 acres in Zones 118, 119 and 121, while a value of $4,750 per acre was placed on the 71.73 acres in Zone 120.

In 1958 and prior years the Commission's assessor had valued the real estate by using a front foot value for the frontage on U. S. Highway No. 1, and applying depth tables. According to the assessor's testimony this method gave too little value to the land in the interior of Potomac Yard. Therefore, the method of valuing the property on the basis of depth tables was changed to valuation on the square foot basis in 1959 after the assessor discovered that locally assessed property was being so valued. The assessment was made on the theory that the 313-acre tract could be used for industrial sites.

J. Edward Rountrey, a former real estate assessor for the City of Richmond, testified for the railroad. He stated that in his opinion the fair market value of the real estate as of January 1, 1960, was $2,574,425, and that after applying the 40% assessment ratio the real estate should have been assessed at $1,029,770; that he, in conjunction with Edward Holland, of Holland Engineering Company, had devised a plan for developing the property as an industrial park, with

some commercial use, which he believed would produce the maximum revenue to an owner who was desirous of disposing of his property to the best advantage; that if the property were developed according to his plan the real estate could be disposed of for a gross sum of $9,946,267; that the cost of developing the real estate would amount to $7,371,842, with the result that the owner would net the sum of $2,574,425, which he considered the fair market value of the land.

Ebner R. Duncan, testifying for the railroad, corroborated the testimony of Rountrey and stated that in his opinion the value placed on the property by Rountrey was correct.

The City of Alexandria called four witnesses, the first being Wilbur S. Ratcliffe, Jr., Deputy Real Estate Assessor for the City, who agreed with the railroad company that the highest and best use to which the real estate could be put would be to develop it as an industrial park. He stated that in his opinion the fair market value as of January 1, 1960, was $8,900,000. He arrived at the valuation on the industrial park plan, after conferring with the Planning Director of the City and valuing the lots in the proposed subdivision by comparison with fifty-two sales of industrial or commercial property in the vicinity. He was of the opinion that the retail value of the lots in the proposed industrial park was $20,350,000, from which should be deducted costs and expenses of $11,450,000, leaving a net amount of $8,900,000 which represented the fair market value, subject to the 40% assessment ratio.

Arthur M. Fisher, a qualified appraiser, testifying for the City said the fair market value of the real estate as of January 1, 1960, was $8,275,000. He was of the opinion that the industrial park plan would put the real estate to its highest and best use; that the lots in the proposed industrial park would have a retail value of $20,990,784, from which he deducted $12,715,784 to cover development costs, thereby reducing the net amount to $8,275,000, subject to the 40% ratio.

Robert L. Kane, a qualified real estate appraiser, testifying for the City stated that in his opinion the real estate was worth 70¢ per square foot as raw land, which would produce a value of $9,544,000.

Philip B. Hall, Director of Public Works for the City, testified that he had calculated the costs used by witnesses Ratcliffe and Fisher and that in his opinion the costs for developing the property were approximately correct.

The questions involved on appeal, says the railroad, are:

1. Should the real estate involved have been valued as if it were real estate owned by someone other than a public service corporation or should the value used in assessing this real estate have been reduced in view of the facts (a) that the real estate is railroad property devoted to a special use; (b) that the railroad receives a limited return from the real estate from long-term contracts; and (c) that the value of a railroad's franchise must be eliminated in valuing its real estate?

2. Did the real estate involved in this proceeding have a fair market value as of January 1, 1960, of $8,181,992?

The Commission, in its unanimous opinion, had this to say:

"In valuing land the Division proceeds as follows: It aims to value the land of utilities on the same basis that other similar land is valued by the assessing officers of the locality in which the land is. The first step is to pick out numerous pieces of similar land. In making that selection an element of judgment is necessarily involved. The Division notes the *appraised* value of the locally assessed similar land. If the appraised value appears to be within 15 or 20% of the actual fair market value, the Division treats the appraised value as being full market value. It appraises the utility land in the same manner and assesses it at 40% of the appraised value.

"Market value is the price at which property can be sold. The amount received by the seller will, of course, be diminished by the costs of making the sale. Mr. Dickinson testified that local appraisals in Alexandria were 80 or 85% of selling prices. * * * The value to be taxed is the value of the property in the hands of the taxpayer. He found that industrial land in Alexandria was locally appraised at around $1.25 a square foot. * * * The information available in the present situation was that good industrial sites in Alexandria were worth around $1.25 a square foot, some more and some less; and that it would cost a lot of money to clean up the 313 acres and prepare them for the market. Exercising his judgment, Mr. Dickinson reduced the $1.25 average figure to an average figure of 60 cents.

"* * * He proceeded in the same manner in which he had proceeded in countless other cases. He followed the procedure that he followed in appraising the Acca Yards and numerous other railroad marshalling yards as well as a great variety of public utility properties. * * * The prior valuation of Potomac Yards had been much too low. The railroad concedes that the prior valuations were too low, and it has enjoyed the benefit of those erroneous underassessments; * * *.

"* * * As a practical matter the only way Dickinson could assess

this property was the way he did assess it. He gave it as his best judgment that, before the property was put in shape to sell, it would bring about $8,182,000. He assesssed it at 40%, or $3,272,797."

■ Real property in Virginia must be assessed at its *fair market value*. This is a mandate of Section 169 of the Constitution which provides: "Except as hereafter provided, all assessments of real estate and tangible personal property shall be at their fair market value, to be ascertained as prescribed by law."

Whatever the rule may be in other jurisdictions, the plain provision of Section 169 of the Constitution which requires all real estate to be assessed at its fair market value is the only legal rule which can be used for the assessment of real estate in Virginia. *Lehigh Portland Cement Co.* v. *Commonwealth*, 146 Va. 146, 151, 135 S. E. 669, 670, 671.

The State Corporation Commission is required to appraise real property belonging to railroads in Virginia by virtue of Section 176 of the Constitution and Section 58-522 of the Code.

Section 176 of the Constitution provides that the Commission shall annually ascertain and assess in the manner prescribed by law the value of real estate owned by railway companies (except the franchise) in this State.

Code, § 58-522, passed pursuant to § 176 of the Constitution, contains the provision that the real estate of railroad companies (but not the franchise) shall be assessed on the valuation fixed by the Commission, at the same rate as real estate of natural persons.

The Commission being aware of the rule of uniformity set forth in § 168 of the Constitution, and being cognizant of the long-recognized practice of valuing all real estate appraised by it at 40% of fair market value, the appraisal of $8,182,992, the determined fair market value of the property, was multiplied by 40%, arriving at the figure of $3,272,797.

The railroad cannot complain of the practice adopted by the Commission of appraising its property at 40% of fair market value. This practice stems from a recognition on the Commission's part of the policy across the State of undervaluing this class of real estate. In the case of *City of Richmond* v. *Commonwealth*, 188 Va. 600, 628, 50 S. E. 2d 654, 667, we said:

"On the whole case, in light of the practices which have continued over the years, we cannot say that the action of the Commission, in making the assessment complained of at forty per cent of the fair

market value of appellee's properties, constitutes an abuse of the authority and discretion confided to it by the Constitution and statutes of the State."

For an exhaustive treatment of the taxing procedures in Virginia as they apply to public service corporations, see *City of Richmond* v. *Commonwealth, supra.*

■ The railroad next contends that its real estate can only be put to special use and should not be appraised at its fair market value, relying upon our decisions in *Washington Bank* v. *Washington County,* 176 Va. 216, 10 S. E. 2d 515; *Skyline Swannanoa* v. *Nelson County,* 186 Va. 878, 44 S. E. 2d 437; and *Tuckahoe Woman's Club* v. *City of Richmond,* 199 Va. 734, 101 S. E. 2d 571. These cases are not in point. They deal with buildings rather than raw lands.

The *Washington Bank* case dealt with a bank building. In that case it was pointed out that there was no general demand for bank buildings and as a consequence the fair market value was less than that ascribed to it by the City Assessor.

The *Skyline Swannanoa* case dealt with a mountainous country estate on which was situated a mansion built of imported marble, costing over a million dollars. The history of the mansion was reviewed and it was pointed out that the cost of such an edifice should not be considered as it had no useful purpose, and the test for assessment was its fair market value.

The *Tuckahoe Woman's Club* case dealt with a club building as to which, because of its character as a special purpose building, we held that the market value of the property was considerably less than the cost of construction and that the fair market value rule would have to be followed. There we further held that "In estimating the value * * * all the capabilities of the property and all the uses to which it may be applied or for which it is adapted, are to be considered, but it is not a question of the value of the property to the owner." 199 Va., at p. 738, 101 S. E. 2d, at p. 574.

In the instant case we are dealing with property which is susceptible to many uses, one of which, the industrial park plan, is recognized by the railroad.

■ The railroad next contends that certain long-term contracts yielding limited returns should reduce the value of the land. Here it is pointed out that there exist two long-term contracts with other railroads, one of which was entered into in 1901, and the other in 1927 to formalize a memorandum agreement entered into in 1905,

both of which contracts are to continue until the year 2001. Therefore, the railroad says, it is prohibited from using the real estate for any purpose other than that for which it is now being used without the consent of the other parties to the contracts. Under the terms of these contracts appellant receives an annual return of $12,500 from the real estate, and it is contended that the Commission's assessor should have reduced his valuation because of the limited return which the railroad receives. This is without merit.

In this connection, we agree with the Commission's opinion wherein it is said:

"The lease is a contract for the joint use of the marshalling yards by the R. F. & P. and other railroads. The other railroads control a corporation that owns a majority of the stock of the R. F. & P. If such an arrangement could result in reducing the taxable value of land, large values would escape taxation altogether because the interest of the lessee is not taxable. (The interest of a lessee is taxable only when the fee simple is exempt from taxation to the owner. Code, § 58-758.) If I own land worth $10,000 I cannot escape taxation by renting it to a friend for one dollar a year. And tax assessors cannot be expected to ascertain whether the lessee is a friend or a controlling stockholder of the lessor. The property subject to taxation is the fee simple and not the reversion after the expiration of a lease."

In *Donovan* v. *Haverhill*, 247 Mass. 69, 141 N. E. 564, 30 A.L.R. 358, it is said:

"Manifestly the entire estate to be taxed may be made up of various tenancies, vested and contingent, as well as leasehold interests, the value of which in many cases it would be impracticable to determine. It is plain a deduction of the surrender value of a long-term lease from the market value of the estate, ascertained by a sale of the land free of the lease, in many instances would seriously impair the taxable valuation of the estate considered as a whole; and that the entire estate would escape taxation to the extent of the tax upon the value of the leasehold interest to the estate for the purpose of extinguishment. We do not think a determination of the fair cash valuation of real estate requires the assessors to make such a deduction."

It is next contended that the value of the land should be reduced by the value of the railroad's franchise. This position is untenable for several reasons. In the first place, no franchise value was proved and therefore there was nothing to deduct. The franchise value does not enter the picture and cannot be taken into account.

In the second place, Section 176 of the Constitution provides that the Commission shall assess, among other things, "real estate * * * and all other personal property whatsoever (except its franchise * * *)." Thus the franchise value is expressly excluded. Code of Virginia, § 58-522.

Finally the railroad contends that the Commission has overvalued its property. The appraisement of the property in this case has been made in accordance with the Commission's rules which have been followed in many instances and over a long period of time. All appraisals leave room for differences of honest opinion, and we hold that the appraisal in this instance comes within that range. As quoted in *Griffin* v. *Norfolk County*, 170 Va. 370, 375, 196 S. E. 698, 699:

"The value of property is a matter of opinion and there must necessarily be left a wide room for the exercise of opinion, otherwise courts will be converted into assessing boards and, in assuming to act as such, would assume the powers lodged elsewhere by the lawmaking branch of government. Judge Cooley says in Cooley on Taxation, section 1612: 'Courts cannot substitute their judgment as to the valuation of property for the judgment of the duly constituted tax authorities.' " *City of Norfolk* v. *Snyder*, 161 Va. 288, 292, 170 S. E. 721.

The findings of the Commission are presumed to be correct, and the burden was on the railroad to prove otherwise. This it has not done.

The order of the Commission is

*Affirmed.*