## Richmond

# RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY

v.

## STATE CORPORATION COMMISSION, et al.

August 31, 1978.

Record No. 780073.

Present: All the Justices.

*Fred C. Alexander, Jr.; Urchie B. Ellis (Boothe, Prichard & Dudley,* on brief) for appellant.

*Charles G. Flinn, Deputy County Attorney; Lewis S. Minter (Jerry K. Emrich, County Attorney; David R. Lasso, Assistant County Attorney,* on brief) for appellees.

COMPTON, J., delivered the opinion of the Court.

In this appeal of right, we review the assessment established by the State Corporation Commission for the 1975 tax year on 156 acres of real estate in Arlington County owned by the Richmond, Fredericksburg and Potomac Railroad Company.

The Constitution of Virginia and the pertinent statutes require the Commission to assess for local taxation the value of the real property of railroads and other public service corporations. Under the procedure, the Commission's Division of Public Service Taxation initially determines the appraised property value. This valuation is furnished to the railroad and becomes "the fair cash value" of its real property which must be reported annually to the

Commission, together with the designation of the locality in which such property is situated. Code § 58-524. The assessed values are then determined by the Commission, acting in its administrative capacity, and are certified to the locality, which applies its own tax rate to such values and levies the tax. Code § 58-522.

In making the assessment which is the subject of this controversy the Commission appraised RF & P's Arlington property at $44.6 million for an assessed value of $13.2 million. With application of the Arlington County tax rate for 1975 of $3.78 per $100 of assessed valuation, RF & P paid taxes for that year of $499,973.86 on the land in question. The total tax paid in 1975 to Arlington County was in excess of $516,000, but that figure included the tax on all improvements, which is not in issue here.

In November of 1975, the railroad filed its application, pursuant to Code § 58-672, for a review and correction of the assessment, asked that the valuation be reduced, and sought to recover from Arlington County the excess taxes paid on account of the allegedly erroneous assessment. During eight days between September of 1976 and February of 1977, the Commission conducted a hearing on the application, which was opposed by Arlington County and the Commission staff. In a December 1977 order, accompanied by a written opinion, the Commission affirmed the tax assessment and denied the relief sought in the application. The RF & P has appealed under Code § 58-679.

The real estate in question, which included carrier (operating) and non-carrier parcels, is a part of Potomac Yard, a large railroad classification facility located in a densely developed part of Arlington County and in the City of Alexandria. The Arlington County portion of the Yard lies in a generally north-south corridor formed by Jefferson Davis Highway (U.S. Route 1) on the west and George Washington Memorial Parkway on the east. This approximately two-mile-long area extends from the Potomac River on the north to Four Mile Run on the south.

The Commission valuation was stated by reference to 15 tax zones shown on two railroad valuation maps introduced as exhibits. Carrier parcels, consisting of five zones containing 116.5 acres, yielded a fair cash value of $31.7 million. Non-carrier parcels, virtually all of which were under lease to third parties at

the time of assessment, consisted of ten zones containing 39.5 acres and were valued by the Commission at $12.9 million.

According to the evidence, the method used by the Commission appraiser to value the land was to compare the subject property with other land which was appraised by the locality. Initially, and immediately prior to evaluating the railroad's property, the Commission obtained from the Arlington assessor the most recent local assessment on properties adjacent to the railroad property. This gave the Commission appraiser an overview of the property surrounding the railroad parcels together with the values as determined by the local assessor for local real estate taxation purposes. The Commission appraiser then inspected the railroad property and proceeded to make his determination of value.

In determining the value of the railroad parcel, the appraiser would calculate an average of the unit (acre or square foot) value as determined by reference to the value of the surrounding property. This preliminary unit value was adjusted for characteristcs peculiar to railroad property. For example, the preliminary or "base" unit value was discounted for such factors as peculiar parcel size or shape, poor topography, lack of public sewer and water service, and poor or lack of access to public streets. The adjusted unit value was then multiplied by the number of units in the assessment zone. This value was next multiplied by a "factor" of 1.1627, to be discussed in more detail *infra*. According to the record, "[i]n some instances the product was rounded. . . .The result of the previous multiplication was again divided by the number of units (square feet or acres) in the zone being appraised. This amount [was] sometimes rounded. . . .The last step [was] to again multiply the adjusted unit value resulting in [the prior step] by the appropriate area measure. The result [was the Commission's] final Fair Market Value for the zone."

As stated in the opinion of the Commission, it determines value "by 'comparing' railroad *land* with what the appraiser considers comparable nearby *land* – without regard to any improvements on either." The opinion further states that "[i]n appraising public service property, the [Commission] appraiser does not perform 'fee appraisals', nor has he ever done so. His purpose is to arrive at a land value for tax purposes which will result in railroad property

bearing with adjoining and nearby land an equal share of the local tax burden."

To the foregoing valuation determined by the Commission, an appropriate percentage established by law was applied, producing the assessment for local taxation.

The use of the "factor", *supra,* under attack by the RF & P in this proceeding, resulted from the enactment in 1966 of the so-called "Bemiss Bill", Code § 58-512.1.[1] Prior to 1966, the assessed values of public service property were usually determined by applying a uniform 40 percent assessment ratio. This was in recognition of the fact that the mandate of the Constitution of Virginia, now Article X, § 2, requiring real property to be assessed at fair market value, had been "so honored in the breach that no assessors [felt] called upon to apply it in practice." *Washington County National Bank* v. *Washington County,* 176 Va. 216, 218, 10 S.E.2d 515, 516 (1940). *See Southern Railway Co.* v. *Commonwealth,* 211 Va. 210, 214, 176 S.E.2d 578, 581 (1970). But the Constitution, now Article X, § 1, also provides that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax. So the courts, "recognizing the general custom of undervaluing property and the difficulty of enforcing the standard of true value, . . .sought to enforce equality in the burden of taxation by insisting upon uniformity in the mode of assessment and in the rate of taxation." *Id.* Thus, this court had said that the Commission's practice of assessing public service

---

[1] Section 58-512.1 (1974 Repl. Vol.), at the time of the assessment, provided:

"Any increase in the assessed valuation of any public service corporation property in any taxing district shall be made by application of the local assessment ratio prevailing in such taxing district for other real estate as determined by the most recently published findings of the Department of Taxation; provided, however, that on January one, nineteen hundred sixty-seven, one twentieth, and on each subsequent January one for nineteen years an additional one twentieth, of the assessed valuation on January one, nineteen hundred sixty-six, (reduced by forty per centum of the value of the amount, if any, by which total retirements since January one, nineteen hundred sixty-six, exceed total additions since that date), shall be assessed by application of the local assessment ratio as provided above, and the remainder shall continue assessed by application of the forty per centum assessment ratio as heretofore administered. Thereafter the whole shall be assessed by application of the local assessment ratio as provided above provided however, such property will be assessed at its fair market value at the time of each assessment.

"On the request of any local taxing district in connection with any reassessment of property representatives of the State Corporation Commission shall consult with representatives of the district with regard to ascertainment and equalization of values to help assure uniformity of appraisals and assessments in accordance with the provisions of this section."

company property at 40 percent of its fair market value was not an abuse of discretion. *Id.*

After 1966, the Commission's Division of Public Service Taxation was required under the Bemiss Bill to apply to appraised values, not the uniform 40 percent rate, but "the local assessment ratio prevailing in such taxing district for other real estate as determined by the most recently published findings of the [State] Department of Taxation; . . . ."[2]

Accordingly, in fixing the assessment of the subject property as of January 1, 1975, the Commission staff was required to apply, not a rate of 40 percent, but a ratio of 29 percent to the full value, such percentage being the latest local assessment ratio for Arlington published by the Department of Taxation at the time.[3]

The foregoing "local assessment ratio" is based on the relation of locally assessed values to true fair market value. Thus, for the applicable period prior to fixing the assessment, the Department of Taxation had determined that property was being assessed by the locality at 34.4 percent of fair market value in lieu of 40 percent, the fixed multiple actually used by the County. Therefore, when the Commission became obligated under the Bemiss Bill to use a lower ratio to determine the assessed values instead of the

---

[2] The continued use of the uniform 40 percent factor in assessing public service property during the 20-year equalization period under the Bill is not in issue here. The equalization aspects of the Bemiss Bill were summarized in *Southern Ry. Co.* v. *Commonwealth,* 211 Va. at 217-18, 176 S.E.2d at 583, as follows:

"The General Assembly of 1966 came to grips with the problem that had been created by the practice of some localities of undervaluing property for assessment purposes and applying a high rate; and the policy of the Commission of assessing property of public service corporations at a rate of 40% of fair market value. The Legislature took cognizance of the inequities that existed and their need for correction. It also recognized that it would have to allow a period of time for adjustment. Accordingly, it enacted Code § 58-512.1 designed to equalize gradually, over a period of twenty years, the assessment of all public service corporation property with the respective ratios in force in localities where the properties are located."

[3] The opinion of the Commission notes that when the appraisal was prepared *prior* to a determination of the assessment, the Arlington County ratio was 34.4 percent, dropping to 29 percent before the Commission actually fixed the assessment. The 29 percent ratio was used in determining *assessed values,* but the 34.4 percent ratio was used in computing the "factor" of 1.1627. This practice was followed because the Bemiss Bill requires use of the local assessment ratio". . . as determined by the *most recently published* findings of the Department of Taxation". (Emphasis added).

ratio of 40 percent (which was also the local fixed multiple), it became apparent to the Commission, according to its opinion, that the assessed values fixed by it "would almost invariably be less than the assessed values placed upon the 'comparable' land areas" by the locality.

The Commission opinion illustrates this problem as follows: "[L]et's apply the 1975 Arlington County local assessment ratio (determined by the Department of Taxation) to a typical situation. The local 'comparable' parcel is appraised at $1,000; finding the public service parcel identical, the Division of Public Service Taxation fixes the value of the public service parcel also at $1,000. Arlington would apply its fixed multiple (which was 40 percent in 1975) to the locally assessed 'comparable' – resulting in a taxable value of $400.00. On the other hand, [the Commission] was required by §58-512.1 to apply the Virginia Department of Taxation local assessment ratio of 29 percent to the appraised value in order to arrive at the assessed value of the public service parcel. The taxpayer subject to the local 40 percent rate would pay taxes on land having an assessed value of $400.00 while the owner of the public service parcel would pay taxes on land assessed at only $290.00, although both parcels were found to have the same appraised value."

The Commission further states in its opinion that to avoid the foregoing disparity, and to achieve equalization of assessments, and thus taxes, it established the practice of computing the "factor", which "reflects the relationship of locally appraised land values to fair market values determined by the Virginia Department of Taxation." Used as an "additive" to the appraised value of public service property, the factor is calculated by dividing the fixed multiple used locally in establishing assessed values, by the "latest true local ratio" published by the tax department. In this case in 1975, Arlington County's fixed multiple, as we have stated, was 40 percent and the actual local ratio at the time of the Commission's *appraisal* was 34.4 percent, producing the factor of 1.1627, the quotient of .40 divided by .344.

Referring to the prior illustration, the opinion of the Commission seeks to demonstrate how use of the amount produced by the factor results in equalization of the tax burden on the owner of the

public service land and the owner of the land used as a "comparable." The Commission says: "In our example, the privately held land was appraised locally at $1,000. To arrive at its assessed value subject to the local levy the County would have applied its fixed multiple of 40 percent (.40 x 1,000) - resulting in a value of $400 subject to taxation at the local rate. On the other hand, to determine the appraised value of the public service land, the Division of Public Service Taxation would have multiplied the value of the identical comparable (locally appraised at $1,000) by 1.1627, for a product of $1,162.70. While the dollar amount of the latter is greater than the locally appraised value of the chosen comparable, when the Division of Public Service Taxation arrived at the assessed value as required by Code §58-512.1 it had to apply the local assessment ratio determined by the Virginia Department of Taxation (.344 x $1,162.70), which likewise resulted in an assessed value of $400 subject to taxation at the same local rate applied to the 'comparable'. The obvious result is that the tax burden is equalized between owners of locally assessed property and public service companies."

The principal expert witness testifying as to valuation on behalf of the RF & P was Donald C. McCandless. He sought to analyze the Commission's valuation techniques and endeavored to appraise the subject property using what the RF & P calls "traditional approaches to fair market value." McCandless used three methods to determine values of the railroad property. First, he "tracked" or "mimicked" the procedures of the Commission appraiser, correcting so-called "errors and inconsistencies." His second method was basically the same as the first except that he derived his data base from use of all "comparable" industrially zoned properties in Arlington County, and not only those adjacent to the parcels in question. Third, he used what he labelled the "accepted approach to [fair market value] by which the subject property is compared with sales data taken directly from the market." He stated that in this approach he was not limited to the Commission's "over the fence" method, but he identified and investigated the best available sites "reasonably close in size, location and potential use to the subject [property], as well as to the valuation date." He then used his judgment to measure the differences between each comparable

and the property in question, thereby seeking to arrive at the fair market value.

McCandless' Method 1 produced a value of $22.6 million using the "factor" employed by the Commission's appraiser. Method 2 yielded a value of $15.3 million with use of the Commission's "factor." The valuation under Method 3 was $15..4 million without use of a "factor."

McCandless further reduced the foregoing valuations as the result of the effect on some of the subject property of an agreement executed in 1938 between the RF & P and the United States. The so-called "1938 Indenture" embodied the terms of a compromise between the parties which settled property disputes existing for a number of years and, according to the evidence of the RF & P, resulted in a substantial limitation of its fee interest in property to which the agreement applied. For example, according to the railroad's evidence, within the eight areas of railroad property affected by the indenture, the use of much of the property is restricted to construction, maintenance and operation of railroad tracks and ways by RF & P. In two areas, if the railroad's use is abandoned or if the property is used for any other purpose, the interest of the railroad shall terminate and title to the property will revert to the United States.[4] An underwriter for a real property title insurance company, testifying for RF & P, stated that at least three of the affected parcels were not legally marketable. The witness further testified, however, that the state of RF & P's title to all of the eight parcels did not adversely affect or lessen the railroad's ability to use the property for all normal railroad purposes.

McCandless' valuations, after consideration of the effect of the 1938 Indenture, were reduced to the following ranges, expressed in millions: Method 1 - $17.9 to $20.1; Method 2 - $11.8 to $14.0; and Method 3 - $11.9 to $14.0.

Frank A. Crovo, Jr., Comptroller of the RF & P, testified that the railroad's "suggested" fair market value for the subject property

---

[4] While the indenture deals with eight areas of RF & P property, one is not involved in this litigation because RF & P has never been assessed for taxation on it.

was $12.7 million. He stated that this figure included a value of one dollar per square foot for those areas in which the RF & P has "restricted ownership rights" under the 1938 Indenture. Crovo criticized the Commission valuations stating that its appraiser failed to find comparable land values because the immediately adjacent parcels were not similar in "size, zoning or adaptability". He said that even if the adjacent land proved to be comparable, the Commission failed to make proper allowances to bring the railroad land "into comparable condition." He contended that the Commission failed to adequately consider the fact that the bulk of the property was adapted only for permanent use for railroad purposes and thus was not susceptible to development for any alternate use. He also claimed the Commission neglected to take into proper account: the lack of utilities and access to large parts of the land; details such as zoning, shape, and aviation flight patterns of the nearby Washington National Airport; soil conditions; and the restrictions of the 1938 Indenture. He also stated the railroad's view that use of the factor, which accounted for $6.2 million of the Commission valuation, was "totally without justification."

Testifying on behalf of Arlington County was John B. Piper, another expert appraiser. Piper's evaluation, based on what he called "the comparison or market data approach", was $4.8 million less than the value fixed by the Commission appraiser. The Commission's opinion points out that the actual assessment of the property was less than it would have been had the County made the assessment based on Piper's value. Applying the County's fixed 40-percent ratio, the assessment would have amounted to approximately $2.6 million more than the Commission assessment, which was computed by applying the lower assessment ratio, and the other provisions, required by the Bemiss Bill. Piper testified that the restrictions of the 1938 Indenture had no "measurable" effect upon the valuation of the property in question.

The basic question presented on appeal is whether the RF & P has sustained its burden imposed by law to prove that the assessment fixed by the Commission was erroneous. Encompassed within this central issue are two other questions. First, was use of the "factor" proper? Second, did the Commission err in failing to reduce the assessment because of certain limitations on alternate

use of the property imposed by local zoning and other restrictions including the 1938 Indenture?

Upon the basic question, the RF & P points out that under Code § 58-529, the Commission has the statutory duty to determine the value of public service property "upon the best and most reliable information that can be procured". The railroad further notes that, under Code § 58-675, in the event of a hearing the Commission's opinion must be based upon "the evidence introduced at such hearing or its own investigations. . . ." The RF & P then contends that the record in this case "leaves no doubt" but that the Commission's appraisal of the subject property was excessive and was not founded upon the best and most reliable information procurable. The railroad also argues that the Commission's opinion was not based upon evidence contained in the record of the hearing, observing that Code § 58-680 empowers this court to consider the appeal only "upon the record" made below. It contends that the "assessing officer was left free to make the most outlandish calculations of value without the constraints of careful judicial review which the right of appeal implies."

The railroad questions the appropriateness of using the "over-the-fence" method of valuing its property in Arlington County. Disclaiming that this is a "broad attack on such valuation procedure", and conceding that such method "produces a fair appraisal in most instances", the RF & P argues that this technique is not suited "to appraise public service property in densely developed areas with high land values." Stating that the experts for both the County and the railroad agreed that the most accurate way of valuing the property in question was by the use of comparable sales, the RF & P urges that the method of transferring values from an acre of fully developed commercial land to "back railroad land" is patently erroneous.

Furthermore, the RF & P notes that McCandless testified that he had detected "substantial errors in the manner in which the appraisal of Potomac Yard property had been performed," even assuming the validity of the "over-the-fence method". It contends the Commission staff made no effort to explain such errors at the hearing and "neither the fact of the errors nor the lack of any explanation was mentioned in the Commission's opinion."

Finally, contending that the individual valuations advanced by the railroad "were based upon reason in every instance", the RF & P argues that a *prima facie* case of an excessive valuation has been established and that we should find the fair market value of the subject property to be $12.7 million.

■ We are of opinion that the Commission's basic system of determining the appraised value of this railroad land by comparing it with similar private land which has been appraised by the locality is proper. This general method has previously been approved in *Richmond, Fredericksburg and Potomac Railroad Co. v. Commonwealth*, 203 Va. 294, 124 S.E.2d 206 (1962), which involved the Commission's 1960 assessment of that portion of Potomac Yard lying in the City of Alexandria. There, the court also endorsed the Commission's use of the 40 percent assessment ratio as a part of the procedure and determined that the Commission's action in that case was not an abuse of authority and discretion. 203 Va. at 299-300, 124 S.E.2d at 210.

■ The burden is on the railroad to prove that the method used by the Commission is erroneous. As demonstrated by the divergent opinions revealed in this record, experts disagree as to the best method to be employed to establish value, there being no statutory guidance specifying the system to be used. Ascertainment of property values are matters of pure opinion and the courts must, within reasonable bounds, permit the exercise of that opinion, lest they be converted into boards of assessment thereby arrogating to themselves the function of the duly constituted tax authorities. 203 Va. at 302, 124 S.E.2d at 211-12. Here, the railroad has merely advanced the theory that because of the dense development in the area surrounding the subject property, a different methodology is preferable in Arlington County from that used elsewhere in the State. This is not sufficient. The record shows that the assessment system used for the subject property is the same method employed uniformly by the Commission for other railroad property throughout the Commonwealth. Thus, as the Commission argues on brief, if it adopted any one of the four "fair market values" offered in evidence by the RF & P, thereby endorsing the methods used to reach such valuations, such action would conflict with the previously stated requirement of "uniformity in the mode of assess

ment" mandated in *Southern Railway Co. v. Commonwealth*, 211 Va. at 214, 176 S.E.2d at 581.

But in again approving use of the long-standing general method employed by the Commission, we do not endorse use of the factor of 1.1627 as an additive in the manner revealed by this record. On that issue, the RF & P argues that application of the factor resulted in an impermissible variation of fair market values. It contends the Commission had no right to increase the fair market value of railroad property so that the assessment ratio produced a predetermined tax revenue. It urges that the Commission is charged under the law with the annual responsibility of ascertaining the fair market value of railroad property without regard to the ultimate assessment ratio to be used.

The Commission, on brief, defending use of the factor, argues that it was required to make this "substantive change" in the procedure resulting in use of the additive because of the mandate of the Bemiss Bill that specific steps be taken over a 20-year period to "equalize" the assessments of all public service corporations with local assessments. It contends that this "equalization process requires the Commission to use an assessment ratio determined by the Department of Taxation in the manner prescribed by the statute", which results in the disparity heretofore illustrated.[5] Arlington County makes a similar argument in support of the factor.

We believe employment of the factor in this case was contrary to law. Such a procedure directly violates the constitutional provision requiring assessments of realty to be made based upon fair market value. Under the Commission's procedure employed in this case, the assessment was made based upon fair market value increased and inflated by the amount computed by use of the factor. Such a system is constitutionally infirm.

---

[5] The opinion of the Commission, however, in finding its "general use" of the factor to be proper states that: "Prior to the Bemiss Bill, an 'add-on' was made to local appraised values whenever the Division determined that comparables used were appraised at something less than 80 to 85 percent of fair market value." If that statement is meant to assert that, before the Bemiss Bill, an "add-on" was tacked to appraised values as the 1.1627 factor was added here, we find no support for it in the record. And the Commission's brief does not make such an assertion.

This unauthorized practice can be demonstrated by reference to the last several steps in the procedure employed by the Commission, described *supra*, as we look at the notes made by the Commission's appraiser (who did not testify at the hearing) on a typical page of the Commission's appraisal records received in evidence.

The appraiser's note as to assessment zone 121, an area of 35.96 acres, is as follows:

"Same comp. as before on N/L of Rt. 1. 5.60/sq. ft. 7.65, 3.30, 2.90 sq. ft. or an unweighted ave. of 4.86 sq. ft. Using same rule as before, we will double this and use 9.72 sq. ft. or 423,400/Ac. less 1/4 for Size and shape, or 317,500/Ac., less 1/4 for frontage or 238,125 Ac., less 1/4 for utility, topo., holes in rd. and [quit] claim deeds or 178,594/Ac. Use because of size, 178,000/Ac. X 35.96 Ac. = 6,400,880 X 1.1627 = 7,442,303 ÷ 35.96 = 206,961/Ac. Use 200,000/Ac. X 35.96 = 7,192,000 FMV."

Translated, according to the evidence in the record, this means that the comparable parcels used by the Commission appraiser carried local fair market values of $5.60, $7.65, $3.30 and $2.90 per square foot respectively for an unweighted average of $4.86 per square foot. Making the assumption that the value of the comparables was one-half of the value of the railroad property in the zone to be evaluated, the unweighted average was doubled and a value of $423,400 per acre was assigned. Adjustments were then made for size and shape, frontage, and other factors, to arrive at a value of $178,000 per acre. This adjusted unit value was multiplied by the number of units (acres) in the zone and to that product the factor of 1.1627 was applied, increasing the value from $6.4 million to $7.4 million. Then, the $7.4 million was divided by the number of acres. The quotient was "rounded off" and then multiplied by the number of acres, the product being the Commission's "fair market value" for zone 121. The foregoing last several steps, beginning after use of the factor, are nothing more than a "rounding-off" process.

Manifestly, use of the factor inflates and increases a previously determined appraised or fair market value for the zone in question. The fair market values for the other zones were increased in a like manner and the expanded values were totalled, yielding the

appraisal of $44.6 million to which the assessment ratio mandated by the Bemiss Bill was applied to arrive at the assessed value. Such a process is impermissible and cannot be condoned as merely a part of the Commission's "methodology", as the Commission urges.

Even though the fair market value standard required by the Constitution has been honored in the breach by undervaluation of real property for tax purposes, this does not mean that the constitutional requirement has been abrogated.[6] "All assessments of real estate", according to the Constitution, "shall be at . . .fair market value", and the Commission has no authority administratively to alter this mandate.

We do not agree with the argument of the County and the Commission that the equalization process, set in motion by the Bemiss Bill, justifies use of the additive factor. That enactment does not authorize the Commission to increase fair market value of the subject property so that the assessment ratio will produce a predetermined tax revenue, which is the effect of this invalid system. The Bill, note 1 *supra,* merely requires that the true local assessment ratio be applied when any increase in valuation of public service property is made and that certain additional steps be taken to accomplish a 20-year equalization. Indeed, applying the assessment ratio in establishing an additive factor fails to guarantee equal "assessments (hence, taxes)", in the words of the Commission, as the very illustration used by the Commission in its opinion demonstrates. The true assessment ratio in Arlington County dropped from 34.4 percent to 29 percent between the time the Commission initially appraised the subject property and the time it assessed the property. In its example, the ratio of 34.4 percent yielded a factor of 1.1627 which the Commission applied to the parcel appraised at $1,000 for a product of $1,162.70. The opinion then states, *supra:*

> "While the dollar amount of the latter is greater than the locally appraised value of the chosen comparable, when the Division of Public Service Taxation *arrived* at the *assessed value* as required by Code § 58-512.1 it had to apply the local assessment

---

[6] Effective January 1, 1977, all assessments, except those referred to in the Bemiss Bill, must be made at 100 percent of fair market value. Code § 58-760 (1978 Cum. Supp.).

ratio determined by the Virginia Department of Taxation (.344 x $1,162.70), which likewise resulted in an assessed value of $400 subject to taxation at the same local rate applied to the 'comparable'." (Emphasis added).

But this is in error, because when the Commission had to apply the true assessment ratio, it was required to use *29 percent*, which would not have resulted in an assessed value of $400 subject to local taxation. Instead, it would have resulted in an assessed value of $337 (.29 x. $1.162.70), a value subject to taxation *un*equal to the local "comparable". The provisions of the Bemiss Bill contemplate application of the true assessment ratio to the fair market value properly determined and does not authorize employment of the ratio twice–once to compute an additive factor and again to fix the assessment. The equalization of assessments is to be accomplished by use of the formula set out in the statute, which is to be applied after fair market value has been established, and not before.

■ The Commission and the County also take the position that the burden is on the railroad in a case such as this to establish that " 'the assessment is out of line generally with other neighborhood properties, which in character and use bear some relation to that of a petitioner'." *Southern Railway Co. v. Commonwealth*, 211 Va. at 219, 176 S.E.2d at 584, *quoting*, *Washington County National Bank v. Washington County*, 176 Va. at 218, 10 S.E.2d at 516. According to that rule, "'[i]t is not enough to show that it is valued above a rate apportioned to another near-by lot. The inequality must be not only out of line but out of line generally.'" *Id*. The Commission found that the record was devoid of any evidence from which it could conclude that the assessments in question were out of line with any other assessments of public service property in Arlington County or were even out of line with the assessment of other railroad properties in Virginia in 1975. We do not agree that the foregoing standard is controlling here. That rule deals with the uniformity in the mode of assessment question which is not the only consideration in this case; it does not speak to the fair market value standard, with which we are mainly concerned in this proceeding. To adopt the Commission's position as controlling here would mean that if an unlawful method was employed in assessing the real property of railroads and other

public service corporations, such method could never be successfully attacked on appeal so long as it was utilized uniformly throughout the locality or the Commonwealth.

Because there will be a remand of this case, we must address the other issues raised by the railroad. We reject its contention that the Commission staff improperly applied its own method because of the "substantial errors" which McCandless says he discovered during his "tracking" of the system employed by the Commission's appraiser. A close examination of the testimony relevant to this alleged error, contained in approximately 40 pages of the transcript, demonstrates, with one possible exception, merely a disagreement by McCandless with the method used by the Commission appraiser. As to the exception, McCandless stated he found that fair market unit values ascribed to the comparable properties by the Commission assessor varied from those which McCandless says he found in the local assessor's records for the fiscal year 1975. At the most, presence of these alleged errors was an issue of fact which presumptively has been decided against the railroad by the Commisson.

Finally, we address the RF & P's contention that the Commission erred in failing to reduce the assessment because of certain limitations on alternate use of the property imposed by restrictions inherent in the property and by title impediments. A similar issue was addressed in the first Potomac Yard case *supra*. There, RF & P contended that the value used in assessing the real estate should have been reduced because the parcels were railroad property devoted to a special use. 203 Va. at 298, 124 S.E.2d at 209. Essentially the same contention is made here, but in different terminology. Here the RF & P says the valuation should be reduced because many of the railroad parcels in Arlington are not available for "alternate use" due to zoning, soil conditions, aviation easements, availability of competing sites for development, prohibitive development costs and the 1938 Indenture. We reject the contention now as did the court in the prior case in 1962.

Code § 58-524 specifies and classifies the exact nature of a railroad's real and tangible personal property which must be reported annually for assessment by the Commission. The purpose of the statute is not to exempt such property from taxation but to

make the duty of the railroad companies so plain that they do not overlook reporting all of their property. *Southern Railway Co.* v. *Commonwealth*, 200 Va. 431, 437, 105 S.E.2d 814, 818 (1958). As the Commission's opinion points out, there is "no provision of Virginia law purporting to exempt from taxation any property classified under Code §58-524, nor any provision requiring or permitting a reduction in value of such property because of zoning or any other restrictions or limitations upon non-carrier uses. Assessment of railroad property would be impossible if [the Commission] first had to determine present or future availability for alternate uses."

█ Corollary to the foregoing restriction-alternate use argument is the RF & P's contention that the valuation should be reduced on parcels subject to the easements, and other restrictions, provided for in the 1938 Indenture. The railroad's position, as we understand it, is that the only interest which it has in the indentured property is its value for railroad operating purposes or limited industrial uses. It contends that such value has already been reached for taxation as "going concern" value, by virtue of the annual franchise tax paid to the State and measured by gross receipts under Code §58-519. Additionally, the RF & P asserts the "overwhelming" evidence was that the Commission "never knowingly taxed easements of public service corporations, including railroads." There is no merit to this contention. A similar argument was made in the first Potomac Yard case.

In that case, RF & P contended that certain long-term contracts prohibited use of the real estate for any but railroad purposes and on that basis sought reduction of the valuation because of the limited return which the railroad received. In rejecting that contention, this court noted that an estate to be taxed may be made up of various legal interests, the value of which in many cases would be impracticable to determine. The magnitude of such interests could seriously impair the taxable valuation of the property as a whole and, conceivably, the entire estate could escape taxation. We said, quoting from *Donovan* v. *Haverhill*, 247 Mass. 69, 72, 141 N.E. 564, 566 (1923), that "'a determination of the fair cash valuation of real estate [does not require] the assessors to make such a deduction.'" 203 Va. at 301, 124 S.E.2d at 211. The same reasoning applies here.

As counsel for the Commission argues, unless railroad property is taxed upon the classifications contained in Code § 58-524 without regard to the technical state of the title, much of the land would go untaxed. Railroad operating property is mostly valueless to anyone other than the railroad, notwithstanding who may hold the fee, possibility of reverter, or any other vested or contingent interest. This is in sharp contrast to, for example, the situation of a public service power line easement held by an electric utility, which, according to the Commission's opinion, is not assessed by it. Such an easement ordinarily has no effect on the property for local valuation and the real estate is subject to local assessment and full taxation against the fee owner.

And, lastly, the Commission stated it found "no practice supporting an alleged policy of not taxing easements, or similar interests in real estate held by railroads under any classification prescribed by Code §58-524, . . . ." While there may be a conflict in the evidence on this point, we cannot say that such finding is without credible evidence to support it.

Accordingly, for the error in approving use of the additive factor, we are of opinion that the assessment of $44,588,217 is excessive and, on that basis, the order appealed from is erroneous. We will therefore remand the proceeding to the Commission with direction to reduce the assessment to an amount, as shown by this record, that is established without use of the additive. Code §58-680. We will further direct the Commission to order that the railroad has the right to recover any excess of taxes that has been paid, with legal interest thereon and with a pro rata amount of the costs incurred by the railroad, from Arlington County, *id.*, the order to be enforced by mandamus, or other proper process, issuing from the Commission. Code §58-675. In all other respects, the decision of the Commission is affirmed.

*Affirmed in part,*
*reversed in part,*
*and remanded.*