Present: Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and Agee,[1] JJ., and Lacy, S.J.

WEST CREEK ASSOCIATES, LLC, ET AL.

v.  Record No. 071411  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    September 12, 2008
COUNTY OF GOOCHLAND

FROM THE CIRCUIT COURT OF GOOCHLAND COUNTY
Timothy K. Sanner, Judge


This appeal involves numerous applications for relief from the allegedly erroneous assessment of real property taxes.  The primary issue concerns whether a taxpayer must prove manifest error in the "manner" in which a taxing authority arrived at the assessed value of real property or whether a taxpayer can prevail by proving a sufficient disparity between the assessed value of real property and its fair market value.  Because we conclude the circuit court erred by holding that, in order to show manifest error, a taxpayer must prove what information the taxing authority considered and how it arrived at the assessment in question, we will reverse that portion of the circuit court's judgment sustaining a motion to strike the evidence with regard to certain parcels.  We will, however, affirm the portion of the circuit court's judgment holding that

---

[1] Justice Agee participated in the hearing and decision of this case prior to his retirement from the Court on June 30, 2008.

the taxpayers failed to present credible evidence of fair market value with regard to certain other parcels.

MATERIAL FACTS AND PROCEEDINGS

In June 2000, 144 separate limited liability companies with various names (collectively, West Creek) purchased from Bank of America, N.A., as Trustee of the WC Land Trust, approximately 2,500 acres of real estate located in the West Creek Business Park (the Park) in Goochland County (the County).[2]  Each limited liability company was conveyed only a small portion of the acreage, but the total purchase price for the 144 separate parcels comprising the 2,500 acres was approximately 34.1 million dollars.  For the purpose of preparing the deeds, a map of the 2,500 acres was drawn to create 144 separate parcels for recordation purposes.  The map, which the parties referred to as the "Timmons Sketch," did not contain a metes and bounds description for any of the 144 parcels, but the Timmons Sketch was recorded in the land records of the County along with the 144 deeds.[3]

---

[2] Ninety percent of each of the 144 limited liability companies is owned by another limited liability company, with the remaining ten percent owned by Beverly W. Armstrong.

[3] The purpose of creating 144 parcels out of the 2,500 acres and deeding each parcel to a different limited liability company was to obtain long-term capital gains tax treatment should the parcels be subsequently sold.

The Timmons Sketch contained the following notation:

> The parcels described on this sketch do not constitute a subdivision under the provisions of Article IV, Section 1 of the Code of Ordinances, Goochland County, Virginia ("Goochland County"), and a recording of this sketch and the reference to parcels depicted thereon in any deed of conveyance shall not be deemed to imply any approval by Goochland County for a division of property pursuant to the subdivision ordinance of Goochland County, nor shall the depiction of any parcel thereon as a road or right-of-way or the recording of this sketch constitute a dedication of such parcel to Goochland County, the Commonwealth of Virginia, or political subdivision thereof.

Prior to the 2000 sale, the County had assessed the 2,500 acres as 20 separate parcels having a total assessed value of 54.8 million dollars. In 2001, the County conducted its quadrennial reassessment of real property pursuant to Code § 58.1-3252. In that reassessment, the County assessed the 2,500 acres as 144 separate parcels, reflecting the 144 recorded deeds conveying various acreages to the 144 limited liability companies. The total 2001 assessed value of the 144 parcels was 105.4 million dollars. The County assessed a few of the parcels at a value of approximately $1,000 per acre, 40 parcels at a value of approximately $35,000 per acre, and the majority of the 144 parcels at a value of approximately $75,000 per acre.

On December 28, 2004, each limited liability company filed an application for relief from an erroneous assessment of real property taxes for the years 2001, 2002, 2003, and 2004.[4]  In each application for relief, the respective limited liability company asserted that, "[a]lthough there were no changes to the infrastructure and no improvements to the Park between 2000 and 2001, the County ignored the fact that the Park had not been subdivided and subsequently assessed the Park . . . as if it had been subdivided into 144 parcels."  Such assessment was allegedly in error and resulted in an assessed value that "substantially exceeded the fair market value of the Property and was invalid."  The limited liability companies further alleged that the County's assessments were not uniform in their applications and that the County disregarded controlling evidence in making the assessments.

After the circuit court granted West Creek's motion to consolidate the 130 applications into a single action, the case proceeded to a bench trial.  During its case-in-chief, West Creek called numerous witnesses, including William H.

_____

[4] Although 144 applications for relief were filed, the circuit court dismissed 14 of the applications.  The record in this appeal does not disclose the basis for that dismissal.  The issues before this Court relate only to the remaining 130 applications.

4

Goodwin, Jr., who was Armstrong's business associate and participated in the decision to purchase the 2,500 acres and to deed the property to 144 limited liability companies; Steven I. Wampler, the reassessment contractor hired by the County to appraise all real property in the County for purposes of the quadrennial reassessment; members of the County's board of assessors (BOA) and board of equalization (BOE);[5] and its own real estate appraiser, Michael G. Miller.

Goodwin testified that, for purposes of determining how much to offer Bank of America for the 2,500 acres, the Park was divided into three or four phases or quadrants that represented the presence of infrastructure, or lack thereof, and charts were prepared that contained estimates of the costs of developing the water, sewer, and roads in the quadrants that still needed such infrastructure. Using three methods to estimate the value of the 2,500 acres, Goodwin concluded that the property was worth approximately 33 to 34 million dollars. To form his opinion as to the value of the 144 parcels assessed by the County, Goodwin

---

[5] During the quadrennial reassessment, the function of the BOA was to assess the real property in the County at fair market value. The role of the BOE was to resolve appeals by taxpayers challenging the assessed value of real property set by the BOA and to equalize assessments when needed.

assigned a portion of the purchase price to each phase or quadrant, divided that number by the acres in the quadrant, and thereby arrived at the per acre value.

Wampler testified that he used a mass appraisal method to assess real property in the County because that method provided a systematic approach to valuing parcels in large quantities by using characteristics of similar parcels. With regard to the West Creek parcels, Wampler received 144 separate tax cards from the commissioner of revenue, with each card containing the acreage for that parcel. Wampler assessed the West Creek parcels at $75,000 per acre, except for parcels labeled on the Timmons Sketch as "floodplain," "waste," "lakes," or "roads," which he valued at $1,000 per acre. The total assessed value of the 144 parcels, according to Wampler, was $128,664,800.

Wampler acknowledged that, although he was appraising each individual parcel, he spread the $75,000 per acre value "across every bit of dirt out there except waste and roads." Wampler, however, did not believe that every parcel was worth $75,000 an acre. He agreed that the parcels in phase one of the Park's development were worth more than $75,000 per acre and those parcels in phases two and three were worth less than $75,000 per acre. Wampler admitted that he did not consider the cost of

6

infrastructure in his appraisal because County officials told him that the infrastructure "was coming." At the time of his appraisal, he also knew that the water and sewer allocations then available would only support the development of an additional 110 acres of the Park.

In making his appraisal, Wampler used comparable sales of parcels in the Park, which ranged from $63,000 to $120,000 per acre. Wampler stated that he "threw out the highest and the lowest [sales] . . . and came up with [$]75,000." Most of the comparable sales were in the range of $100,000 per acre, but Wampler discounted the 144 parcels to $75,000 per acre in part because they lacked improvements for water and sewer. Wampler also testified that he valued the 144 parcels at $75,000 per acre before he learned about a contract to sell 27 of the 144 parcels for approximately $77,500 per acre to an entity known as "Capital One."

Wampler provided his appraisal and all the information he had collected to the BOA. The BOA adopted only part of Wampler's appraisal of the 144 parcels. It reduced the assessed value of parcels in phase two of the Park to $35,000 per acre. Wampler was not present at all of the BOA meetings and did not know what information the BOA possessed in addition to that which he had provided.

7

Three individuals who served as members of the BOA during the quadrennial reassessment testified at trial. They indicated that the BOA reviewed Wampler's appraisal, but none of the board members who testified could remember why the BOA reduced the assessed value of certain parcels from $75,000 to $35,000 per acre. One member explained that the BOA members rode through the West Creek property, discussed the land, and performed their job with the information they had.

Members of the BOE also testified at trial. The BOE did not agree with the BOA's assessment of the parcels designated as "roads." Thus, the BOE increased the assessed value of the road parcels from $1,000 per acre to either $35,000 or $75,000 per acre, thereby increasing the total assessment by $594,000. The BOE also changed the description of those parcels from "road" to "commercial/industrial." Like the BOA, the BOE members who testified could not recall how the BOE arrived at its equalization numbers.

Miller, who qualified as an expert in the field of real estate appraisal, valued the 144 parcels at 34.1 million dollars, which was the purchase price paid for the 2,500 acres. Miller opined that the parcels should be appraised as a whole, rather than individually, for several

reasons: (1) there were no metes and bounds descriptions for the parcels; (2) the Timmons Sketch was not an approved subdivision of the property; and (3) over two-thirds of the acreage was, according to Miller, "raw land, [with] no infrastructure to it." Miller considered the 34.1 million dollar sale price of the 2,500 acres as "a controlling factor" and used that sale as his comparable sale. He then divided the total acreage into quadrants and assigned a per acre value to each quadrant based on the availability of infrastructure in the particular area of the Park.

In making his appraisal, Miller stated the price per acre in relation to the average per acre sale price for the 2,500 acres, which was $13,552. For example, he valued the best quadrant at about 5.5 times the average per acre sale price, another quadrant with existing infrastructure at 3.5 times the average sale price, the quadrant close to existing infrastructure at twice the average sale price, the quadrant that would be in the third phase of development at 1.3 times the average sale price, and the quadrant with limited access and no infrastructure at about half of the average sale price. Thus, Miller appraised the most valuable quadrant at $75,000 an acre and the quadrant with no infrastructure at $7,500 per acre. Finally, Miller

9

valued the areas of wetlands or waste at a little over ten percent of the average per acre sale price, i.e., $1,614.

Except for the wetlands and waste areas, Miller admitted that he agreed with and adopted the values that Goodwin had placed on the 2,500 acres for purposes of negotiating with Bank of America. In Miller's words, "I also agreed with . . . the way that [Goodwin] came up with [the values]. And I concluded that that was logical and reasonable, and that's what I've come up with." In fact, he acknowledged that he simply did a mathematical calculation in order to arrive at a per acre value for the wetland and waste areas:

> Q Okay. And when you say you do the math, what you're saying is when you got to the bottom line on the fourth page of this chart and you see the values listed, 2001 fair market value, that bottom line, that bottom number, the total is $33,096,832.79. What you're saying is you change the values of the waste parcels so that it would add up to $31.9 million?
>
> A What I did – that wasn't the only thing. I looked at the waste and I divided it out, the million dollars difference, and then in my mind I reconciled it.

Miller criticized Wampler's assessment because, in Miller's opinion, Wampler treated the parcels as if they all were "retail pad sites, where a site is ready to be built upon, it's approved, you have roads to it, you have infrastructure, you have everything that you need in order

10

to go and build a building on it."  Miller also questioned the validity of the comparable sales Wampler used in his appraisal because those parcels already had access to water, sewer, and roads.  Unlike Wampler, Miller believed that the lines on the Timmons Sketch creating the 144 parcels did not increase the value of the parcels because they would not be developed and/or sold in accordance with those lines.

After Miller testified, West Creek rested its case, and the County moved to strike the evidence.  The County contended that West Creek had failed to establish a sufficient record from which the circuit court could conclude that the County had assessed the relevant parcels in violation of Code § 58.1-3984.[6]  In the County's view, West Creek proved only how Wampler appraised the parcels but did not establish what the BOA did with the information provided by Wampler.  Similarly, the County argued that West Creek did not show what information the BOE considered in making the adjustments to the assessments set by the BOA.

---

[6] In relevant part, Code § 58.1-3984(A) provides that, in a proceeding to correct an allegedly erroneous tax assessment, "the burden of proof shall be upon the taxpayer to show that the property in question is valued at more than its fair market value or that the assessment is not

11

In ruling on the motion, the circuit court noted that there is a "presumption in favor of the validity of the assessment and that the taxpayer must show manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded." Continuing, the circuit court concluded that Wampler committed "manifest error" by applying a median value of $75,000 per acre to all 144 parcels even though that figure bore no relation to any particular parcel. The question for the court, however, was whether that error could be "reasonably inferred to serve as the basis for the assessment ultimately arrived at by the board of assessors and the board of equalization."

As to the 90 parcels assessed at either $75,000 per acre or $1,000 per acre, the circuit court overruled the County's motion to strike. Drawing all reasonable inferences in favor of the non-moving party, the court concluded that, since the assessed values matched Wampler's appraised values, Wampler's manifest error could be imputed to the County. The court also concluded that West Creek had presented sufficient evidence at that point in the

---

uniform in its application, or that the assessment is otherwise invalid or illegal."

12

proceedings to establish that those assessments were in excess of the fair market values of the parcels.

With regard to the 40 parcels assessed at $35,000 per acre, the circuit court granted the motion to strike. In the court's view, West Creek had presented no evidence regarding the "manner" in which the County arrived at the assessment of $35,000 per acre for those parcels nor any evidence from which it could infer the methodology used. The court further stated that "the difference in values on those parcels determined by the board of assessors and those set forth by the taxpayers is insufficient to permit the [c]ourt to reasonably infer there was manifest error in the . . . manner of making the estimate or that controlling evidence was disregarded."

The County then presented its evidence, calling as one of its witnesses, Joseph B. Call, III, who qualified as an expert in the field of real estate appraisal. Call explained that, when the County hired him, his assignment was to appraise the 144 West Creek parcels "as separate and distinct parcels, not recognizing the value of other parcels in conjunction with each of the 144 subjects of [his] assignment." Call testified that he began his assignment by researching information in the office of the commissioner of revenue, inspecting portions of the

13

property from existing roadways, interviewing members of the planning staff and the utilities department, and reviewing various maps including the Timmons Sketch of the 144 parcels. Call also inquired about the availability of utilities in the Park and learned about the exact location of existing utility lines, the current capacity of the water and sewer system, and the "chronology of the dealings between Goochland County and Henrico County regarding enhanced utility service as required by users of land within the project." Call concluded that, while the water and sewer capacity at that particular time would not serve the requirements of the Park if it were fully developed, "the [C]ounty had shown good faith and persistence in making efforts to ensure that there were sufficient utilities and capacities to serve existing [land users], as well as any requirements of land users as they might develop within the foreseeable future." He also collected market data and identified "land sales that exhibited similar function and economic characteristics as each of the subject properties."

Call decided that the appropriate valuation method was the "sale comparison approach where comparable sales were considered, evaluated, analyzed, [and] adjusted to . . . provide for a credible value estimate for each parcel."

14

Call determined that any other approach for arriving at the fair market value for the 144 parcels would not have been reliable. Call explained the sales comparison approach that he conducted. First, he "identif[ied] sales which [were] deemed as superior to the subject property and others which [were] inferior to set the upper and lower limits of value." This method permitted Call "to then consider each sale on its own merits and consider the differences between the sale and subject [property] and apply some adjustment." Call explained that "[v]alue factor considerations include those for time, location, physical features, zoning, availability of utilities, and size."

Call identified a number of sales involving parcels with acreage that approximated the sizes of the subject parcels and having "similar soil types, topographical features, locational features, and to some degree availability of utilities and accessibility." Even though all the comparable sales were not timely, Call stated that he could not "ascertain that the market had changed measurably during the period of study [s]o there was no time adjustment." Since all the comparable sales involved parcels in the Park, Call made neither a "locational

15

adjustment" nor "an adjustment for physical features of any significance."

Call did, however, make value adjustments for parcels that did not have utilities or road access. Generally, he valued such parcels at 40 to 50 percent less per acre than parcels with such infrastructure. Call also made adjustments to certain parcels because of their limited marketability. For "lake parcels" as well as parcels containing "floodplain," "swamp," or "wetlands," he assigned a value of $1,000 per acre. Call placed no value on the "road parcels" because, in his opinion, "[w]hatever value they have is inherent in the adjacent lands that [they] serve." Call also made adjustments for certain parcels labeled on the Timmons Sketch as "waste parcels" because they, nevertheless, have "considerable usable land." He valued the usable land in those parcels between $15,000 and $37,500 per acre.

Call concluded that these comparable sales occurring between 1991 and 2000 "yielded prices of $83,333 to $120,000 per usable acre[; the parcels] had usable areas ranging from 7.3 to 38.43 acres[; and t]he mean price during that 9-year period of study was $107,503 [p]er acre." In summary, Call appraised the 144 parcels at values ranging from a high of $90,000-$100,000 per acre to

16

a low of $15,000-$17,500 per acre, excluding those parcels valued at $1,000 per acre or with no value.  According to Call's appraisal, the total fair market value for the 144 parcels ranged from approximately $103,200,000 to $113,700,000.[7]

Call testified about his use of the Capital One sale as a comparable sale.  He admitted "[t]here were some inducements to the Capital One purchase."  Specifically, according to Call, Capital One "would receive about $3 million from the state governor's opportunity fund, about $3 million in county rebates."  Call believed that Capital One would expend over four million dollars for water and sewer line extensions but that the "cost would be rebated by the [C]ounty over the term."  Call concluded that the Capital One sale "at approximately $77,000 an acre should be viewed as a pertinent and excellent indication of values" as to a certain group of the West Creek parcels. Call further testified that he arrived at a value between $70,000 and $75,000 per acre for this same group of parcels without utilizing the Capital One purchase as a comparable sale.

---

[7] Armstrong testified that, if the cost of infrastructure were added to the 34.1 million dollar purchase price, that sum would approximate Call's appraised fair market value of the parcels.

17

When asked why he did not consider the June 2000 purchase price for the 2,500 acres when valuing the 144 separate parcels, Call responded:

> First off, the sale in excess of 2,000 acres has a totally different highest and best use as concluded for each of the 144 units.  Secondly, . . . the large sale would appear to appeal to a different type of purchaser than any anticipated purchasers of [individual lots.]  Thirdly, a comparison of in excess of a 2,000-acre parcel with a smaller of 7 to 25 acres is just ludicrous.  Comparisons in that instance are odious.

> The only comparability with regard to that over 2,000-acre sale of the West Creek project is the fact that it is approximate and timely.  But in no way is it physically similar.  No way does it offer the same economies.  I don't think a size adjustment is possible.  Relying on that sale as an independent indicator of value for any of the 144 parcels would produce an appraisal report that would lack total credibility.

> The use of that sale and that sale alone as an indication of value would be grounds for possible dismissal from The Appraisal Institute and probably revocation of one's appraisal license.

On cross-examination, Call stated that, if someone wanted to purchase the entire acreage in a single transaction, the price would be discounted, maybe down to 34.1 million dollars.  Call, however, reiterated that he had appraised 144 separate parcels, not "the project."  He also admitted that he appraised each parcel believing that the acreage had been subdivided into 144 parcels and did

18

not initially realize the Timmons Sketch was not an approved subdivision under the County's ordinances. He, nevertheless, insisted that fact would not affect his appraisal of the parcels.

Call also admitted that, in making his appraisal, he assumed each parcel had some form of "legal access," except for the few parcels that he had otherwise specifically identified. Call testified that "[if he] were instructed by [his] client to assume that certain parcels have no legal access, then [he] would have to amend [his] opinion of market value for . . . the particular parcels." When questioned about the fact that, after the Capital One purchase, the remaining water and sewer allocation was sufficient only to develop an additional 145 acres, Call explained that he had "reached a comfort level" that led him to believe that water and sewer allocations would be increased as development occurred in the Park.

At the close of the trial after considering all the evidence, the circuit court dismissed West Creek's remaining 90 applications with prejudice. In doing so, it made several rulings that are the subject of this appeal. The circuit court held that the law of the Commonwealth requires an individual assessment of each of the parcels in question even though the 2,500 acres were not "legally

19

subdivided."  In the court's words, "[t]he difference in how the parties regard these parcels has shaped the presentation of the evidence, affected the determination of value, and created a conflict regarding the applicable law."  The court then explained the parties' disagreement about the applicable law.  According to the court, West Creek argued that evidence showing a great disparity between real property's assessed value and its fair market value is sufficient to establish manifest error; whereas, the County asserted that in order to establish manifest error or disregard of controlling evidence, a taxpayer must show "what information the assessing authority had, how that evidence was considered and weighed, and ultimately what was the basis for [the] decision."

Relying on this Court's decision in City of Norfolk v. Snyder, 161 Va. 288, 170 S.E. 721 (1933), the circuit court concluded that the County's position was correct.  The court reasoned that manifest error cannot be established merely by evidence of differing opinions about fair market value but that, instead, a taxpayer must present evidence establishing what information the taxing authority considered and how it arrived at the assessment in question.  The court described the evidence as to how the BOA and the BOE arrived at the assessments in question as

20

"nearly nonexistent" and therefore concluded that West Creek had failed to prove by a preponderance of the evidence either manifest error or disregard of controlling evidence.

In contrast to its view when it overruled the motion to strike West Creek's evidence, the court refused to impute Wampler's manifest error in his appraisal to the County. The court reached this contrary position because of evidence that the BOA met at times when Wampler was not present and had information other than that provided in his appraisal. According to the court, the "best evidence" that the BOA considered other evidence and was influenced by factors unrelated to Wampler's appraisal was its assessment of certain parcels at $35,000 per acre, which was a number not found in Wampler's appraisal.

In an alternative holding utilizing the legal standard urged by West Creek, the circuit court found West Creek's evidence about the parcels' fair market values unpersuasive because West Creek did "nothing more than spread the value of the development across the individual parcels." The court noted that West Creek was able "to negotiate a bulk sale of this property for cash at a price $5 million lower than that initially sought by Bank of America." The court concluded that the bulk sale of the 2,500 acres was not a

21

comparable sale for the purpose of establishing the assessed value of each individual parcel, despite West Creek's urging to the contrary. West Creek's evidence regarding the parcels' fair market values, in the court's words, "fl[ew] in the face of the evidence that land in the . . . Park was selling at prices ranging from $43,000 per acre to $120,000 per acre." The court found it "difficult to accept that any kind of independent appraisal was conducted by Mr. Miller when it matched the testimony of Mr. Goodwin, except for the waste parcels, to the penny." In contrast, the circuit court was persuaded by Call's appraisal and concluded that it supported the assessments in question. The court described Call's appraisal as a "detailed evaluation of each parcel with appropriate adjustments."

On appeal to this Court, West Creek assigns four errors to the circuit court's judgment. First, West Creek asserts that the circuit court "erred when it eliminated the ability of the Taxpayer to challenge the assessment by showing 'manifest error' through the disparity between the assessment and the fair market value of the property." West Creek also claims that the circuit court erred by holding that it did not present sufficient evidence to demonstrate that the County committed manifest error in the

methodology employed in assessing the parcels in question when the assessment was based on Wampler's appraisal that the court had found to be erroneous.  Next, West Creek assigns error to the circuit court's holding that the property in question should be assessed as 144 separate parcels without regard to the fair market value of the parcels aggregated as a whole.  Finally, West Creek asserts that the circuit court erred by holding that the County's assessment may be based on sales of property with "fully developed utilities and infrastructure where no such infrastructure existed for the assessed property, and no such improvements were imminent."

                              ANALYSIS

     We begin our analysis by repeating the well-established principles that guide our review of a circuit court's judgment upholding a taxing authority's assessment of the fair market value of real property.  A taxing authority's assessment is presumed to be correct, and a taxpayer has the burden to rebut that presumption by establishing that the real property in question is assessed at more than fair market value or that the assessment is not uniform in its application.  Code § 58.1-3984(A); Keswick Club, L.P. v. County of Albemarle, 273 Va. 128, 136, 639 S.E.2d 243, 247 (2007); Shoosmith Bros., Inc. v.

23

County of Chesterfield, 268 Va. 241, 245, 601 S.E.2d 641, 643 (2004); Arlington County Board v. Ginsberg, 228 Va. 633, 640, 325 S.E.2d 348, 352 (1985). " 'The effect of this presumption is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment erroneous.' " R. Cross, Inc. v. City of Newport News, 217 Va. 202, 207, 228 S.E.2d 113, 117 (1976) (quoting Norfolk & W. Ry. Co. v. Commonwealth, 211 Va. 692, 695, 179 S.E.2d 623, 626 (1971)). We have held that a taxpayer must show by a clear preponderance of the evidence that the taxing authority committed manifest error or totally disregarded controlling evidence in making the assessment. Keswick Club, 273 Va. at 137-38, 639 S.E.2d at 247; Board of Supervisors v. HCA Health Servs. of Va., 260 Va. 317, 329, 535 S.E.2d 163, 169 (2000); Tidewater Psychiatric Inst. v. City of Virginia Beach, 256 Va. 136, 141, 501 S.E.2d 761, 763-64 (1998).

The initial issue we decide involves the legal dispute between the parties regarding the means by which a taxpayer can show manifest error by a taxing authority in assessing the fair market value of real property. Relying on this Court's decision in Board of Supervisors v. Telecommunications Indus., 246 Va. 472, 436 S.E.2d 442

24

(1993), West Creek contends that a taxpayer can establish

manifest error by proving a sufficient disparity between

the assessed value of real property and its fair market

value.  Thus, according to West Creek, the circuit court

erred by holding, both in the motion to strike and at the

end of the trial, that a taxpayer must prove manifest error

in the "manner" in which the taxing authority arrived at

the assessed value of the real property in question, i.e.,

what information the taxing authority considered and how it

arrived at the assessment.

The County, on the other hand, agrees with the circuit

court's ruling and argues that this Court's precedent

establishes that a taxpayer must prove manifest error in

the taxing authority's methodology and that a mere

difference of opinion as to fair market value is

insufficient to overcome the presumption of correctness

afforded an assessment.  Continuing, the County argues that

a taxpayer must present evidence showing "what methodology

was used, how it was applied, what factual information was

available to the assessing authority when making the

assessments, how that information was considered and/or

what weight it was given, and what information was

disregarded."  Then, according to the County, a taxpayer

must identify the alleged error in the taxing authority's methodology.

In Snyder, we explained why a court cannot substitute its judgment for that of a taxing authority with regard to the assessed value of real property:

> The value of property is a matter of opinion and there must necessarily be left a wide room for the exercise of opinion, otherwise courts will be converted into assessing boards and in assuming to act as such, would assume the powers lodged elsewhere by the law-making branch of government. Judge Cooley says in Cooley on Taxation, section 1612: "Courts cannot substitute their judgment as to the valuation of property for the judgment of the duly constituted tax authorities."
>
> Generally the question as to whether an applicant's property in any particular case has been assessed at more than its fair market value, or out of proportion to other like property, presents a question of fact to be decided by the assessors or the local board of equalization and the result fairly arrived at by them should not be disturbed by the court unless the applicant has carried the burden of showing clearly that the assessment is excessive or out of proportion to that of other like property.
>
> In Charleston & S. Bridge Co. v. Kanawha County Court, 41 W.Va. 658, 24 S.E. 1002, 1005 [(1896)], the court said: ". . . if assessments are to be based upon the opinions of individuals . . . instead of being uniform and bearing equally upon property of the same character throughout the State, the assessments would be as shifting and variable as the opinions of men influenced oftentimes by local causes could possibly make them."

26

161 Va. at 292, 170 S.E. at 723.  We then stated:
"Conclusions of a board of commissioners will not be disturbed unless it appears that there has been a manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded." Id. at 292-93, 170 S.E. at 723 (citing 4 Thomas M. Cooley, The Law of Taxation § 1618, at 3235 & n.58 (4th ed. 1924)) (emphasis added).

Despite the emphasized language, the Court's decision upholding the assessment at issue in Snyder did not turn on the taxpayer's failure to demonstrate "a manifest error in the manner of making" the assessment.  Instead, the Court noted that the evidence showed a difference of opinion about the fair market value of the real property at issue. Id. at 293, 170 S.E. at 723.  The Court concluded that "so long as the assessment comes within the range of a reasonable difference of opinion, . . . when considered in the light of the presumption in its favor, it cannot be said that the assessment is erroneous."  Id. at 293, 170 S.E. at 723.

As the County contends, however, this Court has affirmatively stated in some cases that, in order to rebut the presumption of correctness, a taxpayer must show a manifest error in the manner that the assessment was made

or that controlling evidence has been disregarded. See, e.g., Tidewater Psychiatric Inst., 256 Va. at 141, 501 S.E.2d at 764 (deciding whether the trial court correctly determined that the taxpayer failed to rebut the presumption of correctness by " 'a showing of manifest error or total disregard of controlling evidence' in the [taxing authority's] method of determining the fair market value of the property" (quoting Telecomm. Indus., 246 Va. at 475, 436 S.E.2d at 444)); City of Richmond v. Gordon, 224 Va. 103, 110, 294 S.E.2d 846, 850 (1982) ("The taxpayer must show 'manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded.' " (quoting Snyder, 161 Va. at 293, 170 S.E. at 723)); Tuckahoe Woman's Club v. City of Richmond, 199 Va. 734, 739-40, 101 S.E.2d 571, 575 (1958) (holding that the assessment will not be disturbed " 'unless it appears that there has been a manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded' " (quoting Snyder, 161 Va. at 293, 170 S.E. at 723)); City of Norfolk v. Holland, 163 Va. 342, 345-46, 175 S.E. 737, 739 (1934) (same).

Yet, in other cases, the Court stated only that a taxpayer must show that the taxing authority committed manifest error or disregarded controlling evidence in

28

making the assessment.  The Court's holdings, nevertheless, turned on whether the taxing authority had employed an improper methodology in determining fair market value. See, e.g., Keswick Club, 273 Va. at 139-41, 639 S.E.2d at 249-50 (assessment was not entitled to the presumption of validity because the taxing authority did not properly consider and reject certain methods of evaluation); Shoosmith Bros., 268 Va. at 247, 601 S.E.2d at 644 (finding that the taxing authority "did not commit manifest error in assessing [the taxpayer's property by] using the income method of assessment"); HCA Health Servs., 260 Va. at 330-31, 501 S.E.2d at 170 (evidence was insufficient to show that the taxing authority considered and properly rejected other methods of calculating the value of the taxpayer's real property when it used only a depreciated reproduction cost approach as the sole method of determining fair market value); County of Mecklenburg v. Carter, 248 Va. 522, 526, 449 S.E.2d 810, 813 (1994) (in deciding whether an assessment was uniform in its application, there was "no evidence that the methodology used was erroneous, or that it was not followed in appraising the [taxpayer's] property and each property with which it was compared"); Clarke Assocs. v. County of Arlington, 235 Va. 624, 629, 369 S.E.2d 414, 416 (1988) (finding assessment erroneous

because "neither the assessor nor the trial court factored the contract rent into a determination of the fair market value" of the taxpayer's properties); Smith v. Board of Supervisors, 234 Va. 250, 258-59, 361 S.E.2d 351, 355-56 (1987) (finding assessment erroneous because the taxing authority did not consider actual rent and expense figures in determining the fair market value of the taxpayer's property); Nassif v. Board of Supervisors, 231 Va. 472, 483, 345 S.E.2d 520, 526-27 (1986) (holding that assessment was erroneous because the taxing authority's methodology gave no effect to contract rent); Board of Supervisors v. Donatelli & Klein, Inc., 228 Va. 620, 627-28, 325 S.E.2d 342, 345-46 (1985) (affirming the trial court's decision to reduce the assessment because the taxing authority had disregarded the recent sale price of the property and other factors); Ginsberg, 228 Va. at 642-43, 325 S.E.2d at 353-54 (affirming trial court's judgment reducing tax assessment on the basis that the taxing authority "had ignored the sale price and the contract rents and had relied entirely on highly speculative economic rents").

Despite these cases that support the County's position that West Creek had to demonstrate manifest error in the County's methodology, we also have decisions that turned on nothing more than conflicting evidence of fair market value

30

and whether the taxpayer had demonstrated that the real property at issue was assessed at more than fair market value.  See, e.g., City of Martinsville v. Commonwealth Boulevard Assocs., LLC, 268 Va. 697, 699-700, 604 S.E.2d 69, 70-71 (2004) (after concluding that a taxpayer may challenge an annual levy of taxes without demonstrating that the previous general reassessment was erroneous, the Court affirmed the trial court's judgment, based on conflicting evidence of value, that the real property was assessed at more than its fair market value); Fray v. County of Culpeper, 212 Va. 148, 151, 183 S.E.2d 175, 178 (1971) (because the evidence introduced by both the taxpayer and the taxing authority showed a fair market value less than the assessed value of the property in question, the trial court erred in concluding that the taxpayer had not shown that the assessed value of the property was in excess of fair market value); City of Harrisonburg v. Taubman, 212 Va. 28, 30, 181 S.E.2d 654, 656 (1971) (upon conflicting evidence of fair market value, the trial court did not err in reducing the assessed value of the subject property); Washington County Nat'l Bank v. Washington County, 176 Va. 216, 222, 10 S.E.2d 515, 518 (1940) (evidence of fair market value from several

witnesses demonstrated that the value fixed by the trial court was excessive).

This survey of the Court's decisions leads to the conclusion that the circuit court erred by holding that, in order to show manifest error, a taxpayer must prove what information the taxing authority considered and how it arrived at the assessment in question, i.e., its methodology.  It is correct that, in the majority of our cases, the dispositive issue was whether the taxing authority had utilized an improper methodology in setting the assessed value of real property.  But, we have never explicitly held that manifest error cannot be established simply by evidence showing that real property is assessed at more than its fair market value.  In all cases, however, a taxing authority's assessment is presumed to be correct, Keswick Club, 273 Va. at 136, 639 S.E.2d at 247, and the taxpayer has the burden of proof "to show that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal."  Code § 58.1-3984(A).  When a taxpayer attempts to prove manifest error solely by showing a significant disparity between fair market value and assessed value without showing that the taxing authority employed an improper methodology in

arriving at the property's assessed value, the taxpayer cannot prevail "so long as the assessment comes within the range of a reasonable difference of opinion, . . . when considered in light of the presumption in its favor." Snyder, 161 Va. at 293, 170 S.E. at 723; accord Gordon, 224 Va. at 112, 294 S.E.2d at 851. Thus, we conclude that the circuit court erred in granting the County's motion to strike.

This conclusion does not end our analysis because the circuit court had an alternative basis for dismissing the 90 applications that remained after the court sustained the County's motion to strike the evidence. The court concluded that West Creek had not established those parcels' fair market values because West Creek had done "nothing more than spread the value of the development across the individual parcels." West Creek challenges the circuit court's alternative holding in two respects. It claims that the court erred by valuing the property as 144 separate parcels without giving due regard to the fair market value of the parcels aggregated as a whole and by accepting the County's appraisal that was based on sales of parcels with fully developed utilities and infrastructure. We do not agree with West Creek's position.

First, West Creek acknowledges on brief that the circuit court was correct in finding that, pursuant to Code § 58.1-3290, the County was required to assess the 144 parcels individually.[8] West Creek, nevertheless, contends that the circuit court erred by failing to consider the recent purchase price for the amassed parcels as evidence of fair market value. According to West Creek, the creation of the 144 parcels on the Timmons Sketch was for income tax planning purposes and the total sale price represented the highest and best use of the property as a business park comprised of parcels containing 10 to 20 acres.

---

[8] In relevant part, Code § 58.1-3290 provides that, "[w]hen a tract or lot becomes the property of different owners in two or more parcels, subsequent to any general reassessment of real estate in the city or county in which such tract or lot is situated each of the two or more parcels shall be assessed and shown separately upon the land books, as required by law." Although the assessments at issue in this appeal were part of the County's quadrennial reassessment, other statutes also require the parcels to be assessed individually. See, e.g., Code § 58.1-3281 (commissioner of revenue shall annually, on January 1, "ascertain all the real estate in his county or city, . . . and the person to whom the same is chargeable with taxes on that day"); Code § 58.1-3303 (requiring clerk of each circuit court to provide commissioner of revenue with deed recordation receipt showing, among other things, description of real property conveyed and names of grantor and grantee); Code § 58.1-3309 (requiring information appearing in receipts provided pursuant to Code § 58.1-3303 to be transferred "on the land book and charged to the person to whom the transfer is made").

Contrary to West Creek's argument, the circuit court did not ignore the 34.1 million dollar purchase price of the 2,500 acres. In weighing the evidence, the court, however, concluded that West Creek negotiated a bulk sale of the property at a price significantly lower than Bank of America first sought and that the bulk sale price was not a comparable sale for the purpose of establishing the assessed value of the 144 parcels. Although the purchase of the 2,500 acres was an arms-length transaction between a willing buyer and a willing seller, the court's factual determination that the sale was a "bulk sale" is not challenged on appeal by West Creek. Since the 34.1 million dollar figure represented the "bulk sale" of the 2,500 acres, the County is correct in its assertion that the mere difference between the purchase price and the assessed value was not sufficient to show manifest error or disregard of controlling evidence. As we have previously stated, the recent sale price of real property is "merely one of the factors to be taken into consideration" when determining whether such property has been assessed at more than fair market value. American Viscose Corp. v. City of Roanoke, 205 Va. 192, 196, 133 S.E.2d 795, 798 (1964). The sale price is accorded substantial weight but, contrary to West Creek's position, it is not "conclusive evidence of

35

[the property's] fair market value."  Id.; accord Ginsberg, 228 Va. at 640, 325 S.E.2d at 352; Donatelli & Klein, 228 Va. at 628, 325 S.E.2d at 345.

The circuit court's factual finding also distinguishes the present case from the situation in Donatelli & Klein. There, the recent sale of the subject property "was not a sale in bulk, because the sale of each individual property was negotiated separately to its ultimate purchase price." 228 Va. at 625, 325 S.E.2d at 343.  Thus, we concluded that the trial court did not err by according "substantial weight" to the sale price and concluding that the fair market value of each property was the sale price paid by the taxpayer.  Id. at 628, 325 S.E.2d at 345-46.

With regard to West Creek's second challenge to the circuit court's alternative holding, we agree that "fair market value 'is the present actual value of the land with all its adaptations to general and special uses, and not its prospective, speculative or possible value, based on future expenditures and improvements.' "  Fruit Growers Express Co. v. City of Alexandria, 216 Va. 602, 609, 221 S.E.2d 157, 162 (1976) (emphasis in original) (quoting Appalachian Power Co. v. Anderson, 212 Va. 705, 708, 187 S.E.2d 148, 152 (1972)).  West Creek's assertion, however, that the County's assessment was based on sales of parcels

36

with fully developed utilities and infrastructure is not entirely accurate.  Despite the manifest error in Wampler's appraisal methodology,[9] Call took into account the lack of infrastructure and reduced the per acre value of parcels that did not have utilities or road access by forty to fifty percent of the per acre value of comparable sales of parcels having such infrastructure.  His appraisal supports the assessments at issue.

Furthermore, the circuit court, in weighing the evidence, found Call's testimony "the most compelling." "It was within the province of the court, as the fact-finder, to determine the credibility of the witnesses.  The factual determinations of the [circuit] court, like those of a jury, are binding on this Court, and we will reverse such findings only if they are plainly wrong or without evidence to support them."  Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 506 (2007) (citations and internal quotations omitted) (alteration in original); see also Code § 8.01-680; Ivy Constr. Co. v. Booth, 226 Va. 299, 301, 309 S.E.2d 300, 301 (1983) (trial court's findings based on conflicting evidence heard ore tenus will not be disturbed

---

[9] The circuit court held that Wampler committed manifest error by applying a median value of $75,000 per acre to all 144 parcels.  That holding is not challenged on appeal.

37

on appeal unless they are plainly wrong or without evidence to support them).

Moreover, the crux of the circuit court's alternative holding was not that it accepted the County's appraisal but, instead, that West Creek failed to present credible evidence of the parcels' fair market values. In order to satisfy the statutory requirement of showing that real property is assessed at more than its fair market value, see Code § 58.1-3984(A), a taxpayer must necessarily establish the property's fair market value. This is so irrespective of whether a taxpayer is attempting to show manifest error or disregard of controlling evidence by proving a significant disparity between fair market value and assessed value, or by establishing a flawed methodology by the taxing authority in setting the assessed value.

The circuit court enunciated several reasons why it rejected West Creek's evidence regarding the fair market values of the parcels. First, the court found that West Creek's valuation method of "spread[ing] the value of the development across the individual parcels" was not persuasive. The court explained that West Creek purchased 2,500 acres for 34.1 million dollars and now wants to allocate that sale price to the individual parcels. The court, however, rejected the use of the sale price of the

2,500 acres as a comparable sale because West Creek was ignoring the "economy of scale" realized when it purchased the 2,500 acres at one time. The court pointed out that even Goodwin testified that there is an inverse relationship between the size of a parcel and the purchase price, i.e., the larger the parcel, the cheaper the price. Finally, the court concluded that Miller had not conducted an independent appraisal because his testimony "matched the testimony of . . . Goodwin, except for the waste parcels, to the penny."

We cannot say that the circuit court's findings are plainly wrong or without evidence to support them. See, e.g., Booth, 226 Va. at 301, 309 S.E.2d at 301. There is no question that Miller accepted the sale price of the 2,500 acres as controlling and assigned portions of the price as the per acre value for parcels depending on the developmental phase in which the parcels were located. In the words of one of the County's witnesses, Miller's methodology was "an arithmetic formula," which is not an accepted appraisal method. Thus, we conclude, as did the circuit court, that West Creek did not carry its burden of showing that the parcels are assessed at more than fair

market value.  See Code § 58.1-3984(A).[10]  West Creek's

evidence did not rebut the presumption of correctness

afforded the assessments.  Because of the presumption, the

County did not have to come forward with evidence to prove

the correctness of the assessment.  See R. Cross, Inc., 217

Va. at 207, 228 S.E.2d at 117; Norfolk & W. Ry. Co., 211

Va. at 695, 170 S.E.2d at 626.

                          CONCLUSION

     The circuit court erred in granting the motion to

strike West Creek's evidence with regard to the parcels

assessed at $35,000 per acre.  We will, therefore, reverse

that portion of the circuit court's judgment and remand for

further proceedings consistent with this opinion.  See Gina

Chin & Assocs., Inc. v. First Union Bank, 260 Va. 533, 540,

537 S.E.2d 573, 576 (2000) ("following the trial court's

grant of [a] motion to strike [the] evidence [this Court

is] unable to review [the] case in consideration of all the

evidence that may have been produced on the issue in

---

[10] This conclusion makes it unnecessary for the Court
to address West Creek's remaining assignment of error
challenging the circuit court's holding that the County did
not commit manifest error in the methodology it used in
setting the assessments with regard to the 90 parcels that
remained in the case after the court sustained the motion
to strike the evidence.  Assuming without deciding that the
court erred in refusing to impute Wampler's flawed
methodology to the County at that point in the proceeding,

40

question [and is] unable to reach the ultimate merits [of the case]").  With regard to the 90 remaining parcels, we will affirm the circuit court's judgment.

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>and remanded</u>.

---

West Creek, nevertheless, did not establish the fair market values of those 90 parcels.